MARTHA G. JACKSON, Executrix, and THOMAS W. MOYE, Executor, plaintiffs in error, *vs.* THOMPSON JACKSON, SAMUEL MORGAN, *et al.*, defendants in error.

1. It is not error in the presiding Judge to refuse to rule out answers to cross interrogatories, when objected to, on the ground that the answers are not full, especially when the cross interrogatories relate to an immaterial matter.
2. The sayings of an executrix, who is also a legatee under a will, uttered before and at the time of making the will, and forming part of the *res gestæ*, are admissible in evidence against the will.
3. Pending the trial of a case, the parties agreed that the jury might separate for dinner, and at the dinner table a witness for one of the parties, expressed an opinion of the case favorable to the party calling him, and the opinion thus expressed was heard by one of the jurors trying the case, who swears that it had no sort of influence on his mind in making the verdict: *Held,* That the verdict should not be set aside on that ground.
4. A testator may have a mind of sufficient sanity for general purposes, and of sufficient soundness and discretion, to regulate his affairs in general; yet, if it be shown that another person has acquired such dominion and influence over his mind as to prevent the exercise of his discretion in disposing of his property by will, a will made by the testator, under the influence of such dominion, will be set aside.

Issue of *devisavit vel non,* tried before the Hon. E. G. CABANISS, at the August Term, 1860, of Monroe Superior Court.

The questions presented for adjudication in this case arise out of the following state of facts:

On the 19th of December, 1851, John Jackson made and published a will in the presence of O. C. Gibson, Elvers Jordan, A. K. Jordan, and Isaac H. Butler, of which the following is a copy, to-wit:

" GEORGIA—MONROE COUNTY:

"In the name of God, amen!

" I, John Jackson, of said county of Monroe, in view of the uncertainty of life, and the certainty of death, and being specially desirous to make disposition of such property as rightfully belongs to me, do make and ordain this writing to be my last will and testament. Chiefly, I commend my soul to the mercy of Him who gave it, and my body to the earth in decent Christian burial; and of my worldly substance I make the following disposition:

"ITEM.—I hereby direct all my debts paid without delay.

"ITEM.—I bequeath to my beloved wife, Martha G. Jackson, during her natural life, the two lots of land whereon I now reside, and to which I have removed only for a few days, containing four hundred and five acres, be the same more or less; also, all my stock of cattle, hogs, sheep, cows, horses and mules, of every description; also, three negro men, Mark, Austin and Green, a young negro fellow named Henry, a boy named Frank, about fifteen years old, a negro girl named Sarah, a negro woman named Emily, and her three children, George, Augustus and Ann, and at the death of my said wife I give and bequeath all the property named in this item to her and my son, Wiley W. Jackson.

" ITEM.—I give and bequeath the sum of $5 00, to each of my sons following, viz: William P. Jackson, Thompson Jackson, Edward Jackson, Wilkins Jackson, Lewis Jackson, and Andrew Jackson.

" ITEM.—I give and bequeath to my ,son, John Jackson, one negro woman named Martha, and her child John.

" ITEM.—I bequeath to my daughter, Lucy Morgan, wife of Samuel Morgan, the sum of $5 00.

" ITEM.—I bequeath to my son Wiley W. Jackson, one negro fellow by the name of Jim, a negro man by the name of Anthony, the following negro women: Dicey, Rachael, Cynthia, Charlotte, Eliza, Caroline, Louisa, and Mary and her child Fanny; the following negro boys: Emanuel, Solomon, Dennis, Jim, Freeman, Joe, Bill, and Gill; and the

following girls: Hannah, Nancy and Harriet; and I also give and bequeath to my said son, Wiley W. Jackson, the sum of $7,000 00 in cash.

"ITEM.—I give and bequeath to my beloved wife, Martha G. Jackson, all the balance of debts due me at my death, after paying said $7,000 00 to my son, Wiley W., and of money, for and during her natural life, and at her death, I give the same to her, and my son, Wiley W. Jackson.

"ITEM.—In case my said son, Wiley W. Jackson, should die in minority and without issue, I make this item as a condition of, and to, all the property I have given him in this will, viz: the same shall go and become, in that event, the right and property of my said wife during her natural life, and then, at the death of my said wife, (my said son, Wiley W., having died in minority and without issue of his body, as aforesaid), I hereby give and bequeath all the property I have herein named to my wife for life, as well as that given to my son, Wiley W., to the children of my son, John Jackson, except the money and debts due me, herein given to my wife, and that I give to her to dispose of as she sees fit.

"ITEM.—I hereby nominate and appoint Thomas W. Moye my executor, and Martha G. Jackson, my wife, my executrix to this my last will and testament."

On the 17th of July, 1858, in the presence of Jackson Bush, Elvers Jordan, and Jonas Shivers, John Jackson made and published, a codicil to said will, of which the following is a copy, to-wit:

"STATE OF GEORGIA—MONROE COUNTY:

" I, said John Jackson, of said county, do constitute and make this writing to be the only codicil to my last will and testament, executed the nineteenth day of December, 1851, before O. C. Gibson, Elvers Jordan, Ann K. Jordan, and Isaac H. Butler as witnesses, and I say this is to be the only codicil, because two other codicils have been executed by me, one before Elvers Jordan, Jonas Shivers, and Joseph Howard, the 22d of July, 1854, and one before Elvers Jordan, John D. Holmes, and Jonas Shivers, J. P., the 1st day of

May, 1857, and were executed in part, to provide for my children, born after said will was executed.

"ITEM.—I hereby revoke said codicils, but direct that they be not destroyed.

"ITEM.—I hereby revoke the legacy of $7,000 00 in cash, given in my said will, to my said son, Wiley W. Jackson, and in lieu thereof, I hereby give and bequeath to all my children born, or to be born, of my beloved wife, Martha G. Jackson, the sum of $2,500 00; to be subject to the same condition as is made of, and to, all the property given in said will, to my said son, Wiley W.

"ITEM.—I hereby give and bequeath to all my children born, and to be born, of my beloved wife, Martha G. Jackson, share and share alike, the whole of the legacies given my said son, Wiley W., in said will, except the $7,000 00, herein revoked, and hereby declare this item to be an alteration of the legacies in my said will to my said son, Wiley W., so as to have his whole brothers and sisters to share equally with him.

"ITEM.—I give to my beloved wife, Martha G., a lot of land, two hundred, two and a half acres, that I bought at sheriff's sale, in the year 1854, and that corners with my house settlement, and lays East of Thomas W. Moye, in the same way I gave her my settlement of land in my will.

"ITEM.—I hereby give and bequeath all my provisions on hand at my death, of every kind, and the crop growing or gathered, or on hand in any way, one half to my wife, and the other half to all our children born, or to be born of her, the said Martha G., but if necessary for my wife to supply herself, stock and negroes, for the year after my death, she to have more than half, and the children the balance.

"ITEM.—I hereby give to my wife, Martha G., all the increase that the negroes given her may have had, or may hereafter have, and Emily's child, Floyd, now about nineteen months old, in the same way I have given her the negroes in the will. (Munroe is now dead.)

"ITEM.—I hereby give to all my said children, born or to be born of my said wife, Martha G. Jackson, two children

of the woman, Mary, viz:    Willis, about five years old, and Orry Ann, a girl, about three years old, and all the increase that the negroes given in my will to my son, Wiley W., may have had, or may hereafter have.

"ITEM—I hereby give to my son, John Jackson, three boys, children of Martha, Wade, about four years old, Polk, about two years of age, and King, about twelve months old, and the future increase of said Martha.

"ITEM.—The Caroline given in my will to my wife is the blackest and youngest Caroline.

"ITEM.—At the death of my wife, it is my desire that she so dispose of what she may get from my estate, as to divide the same equally among all her and my children, by her, but I do not leave it in her discretion as to-one-third, and I hereby give and bequeath to my son, Thomas B. Jackson, one-third of what my wife may get of my estate, at the death of my wife, Martha G. Jackson.

"ITEM.—I hereby re-publish and declare my said will, with the alterations herein made, to be my last will and testament, with this codicil to the same, and appoint said Thomas W. Moye and my wife, Martha G. Jackson, executor and executrix, to this my last will and testament and codicil.

On the 31st day of August, 1859, John Jackson departed this life in Monroe county, leaving said will and codicil in force.

When the executor and executrix propounded the will and codicil, and proposed to prove the same in solemn form, Samuel Morgan and his wife, Lucy Morgan, formerly Lucy Jackson, Thompson Jackson, Lewis Jackson, Andrew Jackson, William P. Jackson, and Edward Jackson, heirs-at-law of the testator, interposed a *caveat* to said will and codicil, on the grounds following, that is to say :

1st. "That the testator, from extreme old age, imbecility of body and mind, want of memory, and mental weakness, was not capable of making said will.

2d. "Because said will is unequal, inequitable and unjust in all of its provisions, and ought to be declared against.

3d. "Because said will is not the voluntary act of the said John Jackson, he having been moved unduly, and unduly influenced to the making thereof, against his will and desire, by the persuasions, menaces, threats, and practices of the executrix and executor nominated in said will, and others of their family, and the mother of the said Martha G.

4th. "Because said will was procured to be made by the said Martha G. Jackson, her mother, and her family, by fraud, and by falsely and fraudulently operating upon the mind of said Jackson, thereby inducing him to believe that his children, these caveators, were his enemies, and were laying plans and plots to rob and murder him, whereas, in truth and in fact, the said pretences were all without the shadow of foundation.

5th. "Because, at the time of making said will, said testator was laboring under the false hallucination and delusion, amounting to insanity, that his children, these caveators, were his enemies, and were laying plans to strip and rob him of his property, whereas, in truth and in fact, these caveators are, and will maintain and prove as the Court shall direct, that his children were his best friends, and had been most dutiful, faithful and humble towards him all their lives."

At the October adjourned term of the Court of Ordinary of Monroe county, the caveat was overruled, and the will and codicil set up by the judgment of the Ordinary.

From this judgment of the Ordinary, the caveators entered an appeal to the Superior Court.

When the case was tried on the appeal, there was a great number of witnesses sworn, and an unusually large mass of testimony adduced on both sides, from all of which it was made to appear: that old man Jackson, the testator, commenced life a poor man, working hard at his trade of "hatter;" that, although an uneducated man, he had strong common sense, keen perceptions, a clear mind, and great industry, energy and frugality ; that by his first marriage he was the father of seven sons and one daughter; that whilst he labored at his trade, his sons worked in the field, and his daughter cooked and washed at the house; that his sons

labored industriously and assiduously for their father up to their majority, and five years thereafter; that they worked like slaves, and knew no law but their father's will; that they were uneducated, only two of them being able to write their names; that oftentimes they were cheered and encouraged in their incessant toil by the words of their father, of " hurrah, boys, what you are now making will all be yours some day," and " work while you are young, and when you grow old you will have no need to work," and other expressions of similar import; that with the exception of one slight misunderstanding between the old man and one of the boys, the utmost concord and harmony existed between him and his sons up to the time of his second marriage; that his daughter married against his will, and there was a coldness between them ever thereafter; that by the industry and frugality of himself and sons, the old man Jackson amassed an estate worth $50,000 00 or $60,000 00; that some time about the year 1840, testator's wife died, and in September, 1846, he married a second time; that his second wife, who is the executrix and legatee under the will, was a poor, but healthful, handsome girl, of about eighteen years of age at the time of the marriage, whilst the testator was a lean, weak, feeble old man, of about seventy-five years of age, without personal comeliness or attractions; that his second wife was a Miss Moye, whose father was dead, and who, in his life time, was the owner of considerable property, which had been sold by the sheriff under *fi. fas.* against him; that the place on which testator last resided, in Jones county, had been the property of Mrs. Jackson's father, but was sold at sheriff's sale, and bought by testator; that from the time of this second marriage (to which his sons were opposed) the testator and his sons, all save one, became estranged and alienated from each other, and the sons seldom visited their father's house; that one of the sons (who afterwards died before testator) several times threatened to kill his father, cut off his beard, and burn up his house, etc.; that in the latter part of the year 1851, in very cold weather, the testator moved from the county of Jones to the county of Mon-

roe, whilst he was in such a feeble state of health that it was feared that he would die before the journey ended; that the place he left in the county of Jones was a good place, comfortably fixed up, with dwelling, out houses, etc., worth $5,500 00, whilst the place to which he moved in the county of Monroe, was a poor place, upon which the testator could scarcely make a support, and which was located within a half mile of where old Mrs. Moye, the mother of Mrs. Jackson, resided, and near to the Moye family and kinsfolk generally; that in a very few days after the arrival of testator at his new home, in Monroe county, a Mr. Dumas was sent for, and on his arrival, the testator, who was lying upon a pallet before the fire, told Dumas that he wanted him to write a will, and to write it correctly, that his children said that he could not write a will, but that they could break it; that Dumas wrote a will, in which all of his children by his first wife, except one, was given five dollars each, and the whole of his property given to his son, John, who, he said, had treated him as a son should a father, and to his wife, and to his little son, Wiley, by his second wife; that the will was executed and attested in due form, and that the testator seemed to know and understand fully what he was doing at the time; that testator then said, his children had flurried his feelings so that he could not enjoy himself in Jones county, and that they (his children) had mistreated him and his wife; that a few days thereafter, Col. O. C. Gibson was sent for, and went to testator's house to write another will, which was done, and is the will propounded in this case; that before writing, and during the writing, and after the will was written, testator expressed his desire that his son John, and his wife, and his son, Wiley, and gave as a reason therefor, difficulties between him and the other children, saying that they had neglected him and threatened him; that he seemed anxious that the will should be so written as that it could not be broken; that when the will and codicil were written and executed, the testator, though in feeble health physically, had abundant mental capacity to make a will; that on one occasion he was thrown from a horse, in Jones county, and very seriously

injured, and during his confinement from the injury, in the year 1847, Dr. Charles S. Ridley wrote a will for testator; that Dr. Ridley wrote two wills for him; that when first sent for, the testator seemed not to have made up his mind on the subject, and appeared agitated; that in conversations upon the subject, between testator and Dr. Ridley, at which Mrs. Jackson and her mother, Mrs. Moye, were present, Mrs. Jackson would remind testator of his frequent promises to make such a will as she would dictate, saying that she was pregnant, and he had promised to make a will to provide for herself and offspring; that Mrs. Moye would, on these occasions, say yes, Mr. Jackson had made these promises, but that she did not believe he would do what he said he would do; that when Ridley saw that testator was about making a will which in his, Ridley's judgment, was incompatible with justice, he would remonstrate with him, telling him that it was not in accordance with what he had previously said, and asking him, "what will you do for Billy and Andrew? will you not give them something?"—that testator replied, "Martha says Billy is a snake in the grass, and as to Andrew, poor fellow, I have nothing against him, he is unable to take care of himself;" that Mrs Jackson would put in by saying, "yes, Billy is a snake in the grass," and she did not like to hear the name of the Jacksons mentioned; that an anonymous letter had been written, in which she believed they were all concerned, that no one else was mean enough to do it but them, that Sam Morgan was a grand rascal, and was instrumental in writing the letter, and that the Jacksons all followed him; that Mrs. Moye urged testator to fullfil his promise, saying poor Martha is in a certain condition, and would be left in a helpless condition, and she and her orphan at the mercy of the older children; that Mrs. Jackson would evince great concern for the testator in his presence, rubbing her face against his, calling him honey, and otherwise caressing him, and when not in testator's presence she seemed full of levity and hilarity; that when the old man was thrown from his horse, and brought home in an ox-cart, Mrs. Jackson said the children treated him like a dog, allowing him

to be brought in that manner, when the old man replied, that he was hurt in another field, and not where the boys were at the time ; that Mrs. Moye also said that the old man ought to be fed on pound cake, that he could eat nothing else.

The proof also disclosed the fact, that Mrs. Jackson was frequently heard to tell the testator that his sons were laying plans and plots to rob him of his property, and to take his life, and that if he had continued to live in Jones county that his life would have been taken by them, and that they cared nothing for him.

The testimony also showed that Mrs. Jackson was kind and attentive to the wants of the old man, and waited on him very faithfully, and that on several occasions she had been heard to request the old man to give the older children a part of his property, to which the old man would reply that they had not treated him right, and he would give his property to the State before they should have it ; that on other occasions the testator would say that the law made a good enough will for him, and that he did not expect to make one; that he had expressed his regrets that he had ever sold out in Jones county, and moved to Monroe; that it was the worst day's work he ever did ; that on another occasion he stated that he had made a will, but that he did not like it, and requested Mr. Stallings, with whom he was talking, to tell it after his death, and when Stallings replied that the Moyes did not like him, (Stallings,) and that he did not wish to interfere in the matter, the testator said : damn them, I know they don't like you, but I want you to tell it anyhow; that on another occasion, and immediately after Dr. Ridley had written his will, as hereinbefore stated, the testator told Ridley that it behooved him to make a will compatible with the wishes of his wife, as he was growing old, and weak, and feeble, and it was necessary to do so to secure his peace and quiet in the future, and that it was necessary to make such a will as she wanted, to secure peace, and he wished to live in peace the remainder of his life; this was said in answer to Ridley's reference to the repeated assertions of the old man to him, that his older children had

made his property, and that they should have it; that his wife then said to testator, that if he did not wish to make such a will as she wanted, she did not wish him to make any; that on another occasion, in conversation with a Mr. Hardy, the testator was speaking of how he wished his property divided, Hardy said: "Uncle John, you have the reins in your own hands, why don't you fix your business as you want it?" to which the testator replied: "Hardy, I have got into the devil's den, and into the hands of other people, to be disposed of as they please; my health is such that I can't help myself." The proof also showed at the time of making the will and codicil, one of the old man's son's by his first wife was an imbecile, almost an idiot, and incapable of taking care of himself; that all the balance were comparatively poor except one; that his daughter was poor and a weakly woman; that the nine orphans of his deceased son were very poor; that the youngest of his children by his first wife was about thirty-five years old, and the oldest near sixty years of age, and that his estate was worth from $50,000 to $60,000.

Pending the trial, counsel for propounders objected to the reading, by caveators, of the answers of a witness, Ritchie, and Alexander, and Smith, to certain cross interrogatories propounded to them as to the mental soundness, and testamentary capacity of the testator, but the objection was overruled, and counsel for propounders excepted.

Counsel for propounders also objected to caveators introducing, as evidence, the sayings of Mrs. Jackson, the executrix and a legatee under the will, uttered at the time of making the will, and forming a part of the *res gestœ*, but the Court overruled the objection, admitted the evidence, and propounders excepted.

Whilst the trial was going on, it was agreed that the jury might disperse during the recess of the Court for dinner. Dr. Ridley, at the dinner table, and in the presence and hearing of one of the jurors impanneled to try the case, remarked that Wilkins Jackson, one of the testator's sons, who died before testator, had met him one day, and commenced abusing

him, and that he (Ridley) got down and gave him the damnedst whipping he ever got, and that he supposed that he (Wilkins Jackson) told the other Jackson boys of it, as they did not speak to him (Ridley) for a long time, but notwithstanding they were not friendly, he (Ridley) thought the boys ought to have the property, as they worked for it.

This conversation was not addressed to the juror, who made affidavit, that though he heard Ridley's remarks, they made no impression on his mind, so far as his action as a juror was concerned, and did not influence his verdict in the case in the slightest degree.

Dr. Ridley also came into Court, and being re-introduced as a witness, stated, in an apologetic way, what had occurred at the dinner table in the presence of the juror, and the trial proceeded.

The testimony closed, and after argument to the jury, and the charge of the Court, the jury returned a verdict, "that the paper propounded for probate and record, is not the last will and testament of John Jackson, deceased."

Counsel for propounders then made a motion, in due form, for a new trial in said case on the following grounds:

1st. Because the Court erred in overruling the objections of propounders to the answers of Ritchie, Alexander, and Smith, to the cross interrogatories propounded to them, and in allowing said answers to be read.

2d. Because the Court erred in allowing the sayings of Martha G. Jackson, uttered before testator's death, to be given in evidence, against the will, when the same were objected to by propounders.

3d. Because Dr. Charles S. Ridley, one of the witnesses for caveators, discussed the caveat in favor of the caveators, at the dinner table of the hotel in Forsyth, during the pendency of the trial of said caveat, in presence and hearing of the jurors who were trying said case.

4th. Because the verdict is against both the law and evidence of the case.

5th. Because the verdict is manifestly against the weight of the evidence in said cause.

Jackson and Moye *vs.* Jackson *et al.*

After argument had thereon, the presiding Judge over-ruled the motion for a new trial, and that decision is the error complained of.

GIBSON & MOORE, PINCKARD & P. W. ALEXANDER, for plaintiffs in error.

PEEPLES & CABANISS, for defendants in error.

*By the Court*—LUMPKIN, J., delivering the opinion.

The first objection taken in this case is, that the Court erred in permitting the answers of Saphemy Rucker to be read to the first cross-interrogatory; the answer of Nancy Alexander to the fifth and seventh cross-interrogatories, and the answer of Jeremiah Smith to the cross-interrogatories, on the ground that the cross-interrogatories specified were not fully answered. The objection was not to the reading of the interrogatories, because the several cross-questions were not answered fully, but to the reading of the answers to the cross-interrogatories specified, because they were not fully answered. In other words, the propounders objected to the reading of the answers of the witness to their own questions, because they were not fully answered. This is a novel objection. But admit that the objection was to the reading of the whole interrogatories because the cross-questions were not fully answered, we see nothing in the cross-questions which would have availed the propounder, however favorably answered.

The questions asked were immaterial; and the answers, if given, would have been equally so. They inquired of the witnesses their opinion of the testamentary capacity of the testator, and that is not disputed.

2d. The next objection is, as to the sayings of Mrs. Jackson, made before and at the time of the making of the will, to show the undue influence which she exerted over the mind of the testator. This Court has held the declarations and admissions competent.

3d. As to the conduct of Dr. Ridley, who, during the

trial, made use of some expressions in the hearing of one of the jurors, I have this to say: It was consented by the parties that the jury should separate for dinner, and the saying of Dr. Ridley, casually heard by the juror, were not intended for him, nor was the witness aware of the juryman's presence. The juryman testified that they had no influence on his mind, and what is more, the Doctor came into Court and stated his inadvertence, and apologized for it; and the cause was suffered to proceed without objection.

4. So much for the skirmishing in the case. We come to the main proof. Was there sufficient evidence of fraud and undue influence to justify the jury in pronouncing against the will? A great body of evidence has been produced on one side, and on the other. I will state briefly the law principles that govern this case. Presumption is always in favor of mental capacity to make a will. Hodge vs. Fisher, 1 Peters Rep., 163. A party may make use of argument and persuasion to procure a will to be made in his own favor. Miller vs. Miller, 3 Serg. and Barber, 219. Extreme old age does not of itself disqualify from making a will. Vamalst vs. Hunter, 5 John. Ch. Rep., 158. There is yet another ground, which, though it comes short of actual force, nor so easy to be proven, yet if it should be made out, would certainly destroy the will; that is, if dominion is acquired by any person over a mind of sufficient sanity as to general purposes, and of sufficient soundness and discretion as to regulate his affairs in *general*, yet if such dominion and influence were acquired over him as to prevent the exercise of such discretion, it would be inconsistent with the idea of a disposing mind, and perhaps, adds Ch. J. Eyre, the most probable instance of such a dominion being acquired, is that of an artful woman having taken possession of a man, and having subdued him to her purpose. Mountain vs. Barnes, 1 Cox, 353.

The testator began life poor. At the time of his unfortunate marriage with Miss Moye he was happy in the society of his children by his first wife. He was seventy-five years old. Some of his children were upwards of fifty. They

Jackson and Moye *vs.* Jackson *et al.*

had literally worn themselves out in incessant toil. Their father's will was law. They knew no other.

He encouraged them in their daily task, early and late, wet and dry, in winter's cold and summer's heat, with the exhortation: "hurrah, my boys, the property you are working for shall be yours; make money while you are young, and when you are old you'll not have to work." They were raised in utter ignorance. Some of them could write their names mechanically, others could not even do that. He met with Martha Moye. She came of a broken down family, whose father's property was sold by the law for debt. She was young and handsome, of blooming seventeen. They were wedded. His bony and bent and decrepid form was not the attraction. He possessed more *shining* qualities. He had, in the language of the testimony, "good land, good property, and a good house, and every other luxury which was usual in the country." And, I will add, a Strong Box, rendered somewhat famous in the criminal history of the State, where was hoarded, in solid coin, the hard earnings of himself and boys. And now, the whole scene changes. In a few months an accident occurred, a fall from a horse, which had well nigh proved fatal. A will had to be written, lest the fruits of this meretricious match should be lost. "Mrs. Jackson," says one of the witnesses, "would honey the old man up ever so much and evince great concern about his situation, in his presence, rubbing her face in his and taking on a great deal; but would laugh and seem unconcerned behind his back;" and Mrs. Moye, the *mother-in-law*, always a dangerous confederate in such cases, pursued a similar course. "Said he ought to be fed on pound-cake, and could eat nothing else." Mrs. Jackson abused the boys very much for sending him home in an ox-cart; "said they treated him worse than a dog." The old man said he "was hurt at the lower plantation, and not where the boys were." She looked scornfully at the boys—would pay them no attention nor stay where they were. She would shed tears and manifest sympathy for the old man when about him, but when not in his presence was gay and laughing.

Dr. Ridley was sent for to write a will, and lest every other artifice should fail, a deception must be practised. "Martha would come around him, go to the window and appear to be sick; she would heave and spit." But notwithstanding these manifestations of pregnancy, no child was born till fourteen months afterwards. Protracted gestation of course, occasioned no doubt by the extreme old age of the father. But let us introduce Dr. Charles S. Ridley upon the stage. The old man at first determined not to make a will. Now was the time for Martha to drop the turtle dove and assume the dictator. "I am pregnant, and you promised to make such a will as I would dictate," is the delicate appeal of the young and artless creature. "Yes," chimed in the *mother-in-law,* "Mr. Jackson made this promise, but she did not believe he would keep his word." Dr. Ridley remarked to Mr. Jackson that he was about to make a will not compatible with justice nor with what he had previously said. "What will you do with Billy and Anderson?" He wanted to know if he would give them something. "Martha says that Billy is a snake in the grass, and not such a friend as he pretends to be." "Yes," she replied, "he is a snake in the grass." "As to Anderson," the old man observed, "poor fellow, I have nothing against him, he is unable to take care of himself." Anderson was an imbecile, and cut off by his father from any portion of an estate worth from $50,000 00 to $60 000 00 with $5 00. Can a mother forget her sucking child, and her mind be free and sane? Can a father, unless enslaved, manacled, "old, weak, feeble," to use his own language to one of the witnesses, "wishing to purchase his peace for the residue of his life at any sacrifice," disinherit an idiot son, and cast him penniless upon the charity of the world, unless under the influence of fraud or undue influence? Upon this single piece of testimony I would annul and set aside this will—any will—every will. And thus the drama opened. Mrs. Jackson would not rest satisfied until she had prevailed on the testator to abandon his children and home and neighbors, under the apprehension that he was endangering his life to remain in Jones

county, and to remove to a poor place in Munroe county, and settle in a half a mile of her mother, who was surrounded by her kin. And now let us glance at the closing scene of the tragedy. He had made two wills and three codicils. Was he satisfied with them? He tells Dr. Stallings that he wants him to let it be known that they were not his wills. But, remonstrates Stallings, "the Moyes don't like me, I do not like to interfere." "Damn them, they don't like me either," was his emphatic reply.

Hardy tried to rouse him from his stupefaction: "Well, John, you have the reins in your own hands, why don't you take the management of your own business?" He said, "I have got into the devil's den and into the hands of other people, to be disposed of as they please. My health is such that I don't help myself. I desire to die and get out of the way." And die he did, as a fool dieth. Talk to me of men of strong will like John Jackson! Sampson was powerless in the arms of Delilah, and how often do you see the warrior, the statesman, yield to the influence of their parasites!

Let the judgment be affirmed.