# WHEELING.

TERESA DOWER *et als. v.* CHURCH *et als.*

Submitted January 14, 1881—Decided December 2, 1882.

(\*SNYDER, JUDGE, Absent.)

1. Upon a bill in chancery to contest the validity of a will, which has been regularly admitted to probate, the functions of the suit are exhausted when that question is decided; and if the will is declared invalid and null, it is not competent for the court to proceed in that cause further, as for instance to establish another will, which had not been offered for probate though this was also asked in the bill by the plaintiffs, the devisees in such alleged will, and though the bill alleged, that this other will had been improperly destroyed. And therefore it is not necessary for the plaintiffs in such first bill to offer any proof of the execution of such first will, before the court directs an issue of *devisavit vel non* as to the will probated. (p. 43.)

2. Upon a motion to set aside a verdict on such an issue of *devisavit vel non*, on the ground that the verdict is contrary to the evidence, the court overrules the motion and makes a decree according to the verdict, and the party moving files a bill of exceptions to the refusal of the court to set aside the verdict, and all the evidence is set out in the bill of exceptions and it is all parol evidence, the Appellate Court will reject all of the evidence of the exceptors, which is in conflict with that of the other party; and if upon the evidence of the appellee, giving it full force and effect, and of that of the appellant not in conflict with it the case is in favor of the appellee, the decree will be affirmed. (p. 63.)

3. If in such a case the plaintiffs in the chancery suit are the devisees under a former will of the testator seeking to set aside a later will, which had been admitted to probate and which revoked the will under which the plaintiffs claimed, the heirs of the decedent should be made parties defendants as well as those parties, that claim under the will of the decedent, which had been probated. (p. 50.)

4. But if in such a case, the heirs of the intestate are not made parties, and no objection is made in the court below till after the issue of *devisavit vel non* has been made up and tried, and the jury has returned a verdict against the will, which has been probated, those claiming under this will cannot then be heard to object

\*Cause submitted before Judge S. took his seat upon the bench.

to the entering of a decree in accordance with the verdict, because the heirs had not been made parties.   (p. 49.)

5. On the trial of such an issue witnesses, who have stated the facts seen by them shortly prior or subsequent to the making of the paper by the intestate claimed to be his will, which indicate the capacity or incapacity of the decedent to make a will, may give their opinion to the jury based on such facts as to whether the testator was or was not competent to transact business of importance. For though the fact, that he was not competent to transact such business, would not prove him incompetent to make a will, yet it is evidence, which in connection with the facts proven and other evidence might tend to show incompetency and is proper to be considered by the jury in trying such an issue.   (p. 59.)

6. A new trial ought not to be granted for evidence discovered after the verdict is rendered, if this evidence be merely cumulative or such as ought not to affect the result; or if it appeared, that due diligence to discover the evidence was not used before the trial.   (p. 57.)

7. A juryman heard, under circumstances unfavorable to his understanding clearly, a casual conversation between a witness in the case and a stranger, neither of whom knew he was a juror, in which comments were made on another witness and on the evidence. The juror remarked to one of them, that the witness criticised wanted to come back and explain his evidence, but was not allowed to do so, and that two other witnesses had contradicted him. He also said, he thought he knew how the jury stood. The stranger then asked some question, and he the juror then informed him he was one of the jury. The counsel of the party against whom the verdict was afterwards rendered, before the case was submitted to the jury, was informed by this stranger of this occurence, but he could not tell the name of the juror. The attention of the court was not called to the matter till after the rendition of the verdict.  HELD:

    That the circuit court did not err in refusing, under these circumstances, to grant a new trial on account of the misconduct of this juror.   (p. 55.)

Appeal from a decree of the circuit court of the county of Mason, rendered on the first day of November, 1877, in a cause in said court then pending, wherein Teresa Dower and others were plaintiffs, and Ann E. Church and others were defendants, allowed upon the petition of said defendants.

Hon. Joseph Smith, judge of the seventh judicial circuit, rendered the decree appealed from.

*John W. English* for appellants:

The issue *devisavit vel non* stands on a very different footing from an ordinary issue out of chancery; it is a law issue tried under the supervision of the chancellor, and not for the information of the conscience of the chancellor, and his conscience is not necessarily satisfied with the verdict. *Coalter's Ex'ors et al.* v. *Bryan and wife*, 1 Gratt. 82, also *Malone's Adm'r. et al.* v. *Hobbs et el.* 1 Rob. 388.

The trial of said issue is direted by statute: "It is a probate jurisdiction to be exercised by the jury, not by the chancellor; his only province is to convene the parties, cause the prescribed issue to be made up and tried, with the incidental power to grant a new trial, and in granting a new trial or refusing it the court would be controlled by the rules governing courts of law with reference thereto:" (same case). Also *Lamberts* v. *Cooper's Ex'ors*, 29 Gratt. 66.

The opinions of unprofessional witnessess in regard to testamentary capacity, without the facts upon which they are based should not be allowed to go in evidence to the jury. See Redfield on Law of Wills, p. 143, § 12, note 20: 2 Greenl. § 691.

The opinions of witnesses in regard to one's competency to do business are entitled to little regard unless supported by good reasons founded on facts which warrant them. Red. Am. Cas. 194; *Kinne* v. *Kinnie*, 9 Conn. 103.

An appellate court will reverse and remand a cause for want of necessary parties although the point was not raised by demurrer in the court below. *Taylor* v. *Spindle*, 2 Gratt. 55, 72; *Armentrant's Ex'ors* v. *Gibbons*, 25 Gratt. 371; *Dabney* v. *Preston's Adm'r*, 25 Gratt. 838; *McCoy's Ex'r* v. *McCoy's Devisees et al.*, 9 W. Va. 443.

A juryman should not be allowed to discuss with outside parties the manner ot witnesses who have testified before them, or the weight and character of the evidence during the progress of the trial. See *Vanmetre* v. *Kitzmiller*, 5 W. Va. 380.

Before the issue *devisavit vel non* will be directed by the court, the parties requiring it must show themselves entitled to an interest in the result of the issue. See Code ch. 78, § 28.

A sentence pronounced by a court having jurisdiction, whether it be a sentence admitting a paper to probate, or excluding it from probate, so long as it remains in force binds conclusively, not only the immediate parties to the proceedings in which the sentence is had, but all other persons, &c. See *Connelly* v. *Connelly et al.*, 32 Gratt. 657.

*Smith & Knight* for appellants.

*Charles E. Hogg* for appellees:

The issue in this case follows the language of the statute and this is sufficient. *Coulter's Ex'ors et al.* v. *Bryan and wife et al.*, 1 Gratt. 19.

The law requiring the heir to be made a party to a suit to establish a will must be, it seems to me, where an interest is asserted in direct conflict with his interest as the legal representative of the testator. 1 Danl. Chy. Prac. (4th ed.) 232.

Applicants have not been injured by the omission of the heir at law of decedent as parties to plaintiff's bill, wherefore the court will not disturb the decree complained of. *Vance* v. *McLaughlin's Adm'r.*, 8 Gratt. 289.

Objection for want of parties obviated by court refusing relief asked for against the heirs at law of decedent. 1 Danl. Chy. Prac. (4th ed.) 292, 294.

Witness may give his opinion as to testator's mental condition based upon what he saw of testator immediately before after and the execution of the instrument written in 1876. 2 Whar. Dig. 485; 11 Serg. and R. 141; *Jarrett et al.* v. *Jarrett et al.*, 11 W. Va. 585; Redf. Am. Cas. on Wills, 53, 68, 69, 89, 93, 140 *et seq.*

Witness may give his impression as to state of affection of testator toward one claiming to be object of his bounty. 1. Greenl. Ev. (Redf. Ed.) § 440.

Court ought not to disturb the verdict of the jury, for technical errors in the admission or rejection of testimony, this cause differing, in this regard, from an ordinary proceeding at law. *Henry* v. *Davis*, 7 W. Va. 720; *Baker* v. *Ray*, 2 Russ. Rep.

The mere conversation of a juryman *per se* will not be sufficient to have the court order a new trial. The correct

rule on this point now is that there must be some manifest influence shown to the prejudice of a party who seeks to set aside the verdict. 1 Am. Dec. 27 note; *Gunnell* v. *Phillips*, 1 Mass. 530; *People* v. *Boggs*, 20 Cal. 432; *Jackson* v. *Jackson*, 32 Ga. 325; *Perkins* v. *Knight*, 2 N. H. 474; *Nesmith* v. *Ins. Co.*, 8 How. Pr. 141.

Where the misbehavior of a jury is known before the jury retires by party seeking to set aside verdict and same is not disclosed to court before verdict is rendered, the verdict will not be disturbed on that ground. *Pettibone* v. *Phelps*, 13 Conn. 445; *Stewart* v. *Small*, 5 Miss. 525; *Fessenden* v. *Sager*, 53 Me. 531; *Jackson* v. *Jackson*, 32 Ga. 325; *Martin* v. *Tidwell*, 36 Ga. 332.

Where after discovered evidence is merely cumulative court will not disturb the verdict. 16 Am. Dec. 729; 17 Am. Dec. 349; 18 Am. Dec. 503; 12 W. Va. 23.

Court will not disturb verdict where evidence is conflicting. 7 W. Va. 665, 715.

As to the unreasonableness of the provisions of the will being considered an evidence of fraud and undue influence in its execution. See Redf. Am. Cas. on Wills, 297, 326, 347, 627 733, 751; Redf. on Wills, 516:

*Henry J. Fisher, jr.*, for appellees:

The necessary parties to a suit in equity are those whose presence before the court is necessary to a complete judgment with respect to the interests involved under the issues raised by the pleadings. *Vide: Green* v. *Milbanks*, 5 Abb. New Cas. 183; *Holly* v. *Van Dusen*, 55 How. Prac. 333.

No one need be made a party complainant, in whom there exists no interest, and no one a party defendant from whom nothing is demanded. *Vide: Kerr* v. *Watts*, 6 Wheat. 550–559; *Story* v. *Livingston*, 13 Pet. 359; 1 Pet. 299.; 14 Wall. 314.

Necessary and indispensable parties are those whose interests will be detrimentally affected by any decree, which can be made. Those whose interests are separate from those before the court are not necessary parties. *Vide:* Mit. & Tyl. Pl. and Pr. 20, 21; 1 McAll. 31, 37.

When a statute prescribes what an issue shall be, and an

issue is directed in the words of that statute, it is enough. *Vide: Coulter's Executors et al.* v. *Bryan and wife et al.*, 1 Gratt. 19.

. Where a court of chancery is resorted to for the purpose of setting up a lost instrument, the rules of that court are applicable, and all persons materially interested in the subject matter, or who will be directly affected by the decree, are necessary parties. *Vide: Mitchell, Sheriff*, v. *Chancellor et al.*, 14 W. Va. 22.

A new trial asked for on the ground that the verdict is contrary to the evidence, will be granted only in a case of plain deviation from right and justice, not in a doubtful case. *Vide: Henry* v. *Davis*, 7 W. Va. 720; *Miller et al.* v. *Insurance Co.*, 12 W. Va. 116.

· A verdict will not be set aside upon the evidence of some of the jurors that they had been induced to agree thereto under a misapprehension of the instruction of the court, if the verdict is in all respects fair, and in the opinion of the judge, who tried the case, in conformity with the evidence. *Vide: Harnsbarger's Adm'r* v. *Kinney*, 6 Gratt. 287.

Affidavits of jurors are not receivable to impeach their verdict, but they may be read in support of it. *Vide: Dana* v. *Tucker*, 1 City H. Rec. 121; *People* v. *Barbour*, 2 Wh. Cr. Ca. 19; *Clum* v. *Smith*, 5 Hill 560; *Brownell* v. *McEwen*, 5 Den. 367; *Haun* v. *Wilson*, 28 Ind. 296; *Dana* v. *Tucker*, 4 Johns. 487; *Messenger* v. *Nat'l Bank*, 7 Dana 581.

When a jury is tampered with by a party to the action, his friend, or agent, then a new trial must be granted. *Vide: Perkins* v. *Knight*, 4 N. C. 474; 1 Strob. 410; 6 N. H. 352.

When the iterference with the jury comes from a stranger, a different rule prevails. *Vide:* 2 Gra. & Wat. on New Trials 309. The brother-in-law of a party to an action holding conversations with a juror before and after he was sworn; the persons conducting the suit being charged with no misconduct, *held*, not a good ground for new trial. *Vide:* Opinion of Yeates, J., in *Blain* v. *Chambers*, 1 Serg. & R. 169.

If the misconduct of a juror is known before the close of the trial, the objection must be made then and not after a verdict. *Vide: Sleight* v. *Hemming*, 12 Mich. 371; *Fessenden* v. *Sager*, 53 Me. 531; *Pettibone* v. *Phelps et al.*, 13 Conn. 445; *Martin* v. *Tidwell*, 36 Ga. 332; *Jackson* v. *Jackson*, 32 Ga.

325; *Stewart* v. *Small*, 5 Miss. 525; and a failure to do so is a complete waiver of the objection.

An issue directed in either of the modes suggested by counsel for defendants and appellants in their argument of errors, on page 5, printed record, would be bad under the ruling in the case of *Schultz* v. *Schultz et al.*, 10 Gratt. 376.

A plaintiff is required to make all proper parties; if he fail to do so, it is too late for him in the appellate court to take advantage of his own omission for the purpose of reversing a decree which is proper and correct in other respects. *Vide: Kincheloe* v. *Kincheloe*, 11 Leigh 398.

Upon the same principle it was equally the duty of counsel on both sides to have the issue in this case properly directed, and to draw it properly when directed; and if they fail to do so, it is likewise too late to take advantage of it in an appellate court.

GREEN, JUDGE, furnishes the following statement of the case:

John J. Weaver, was married December 29, 1829, and lived with his wife till his death, January 15, 1876. He never had any children by her, but after he had been married some twenty years, he had habitually illicit intercourse with one Anna Maria Weaver. In 1850, while such illicit intercourse existed, she had a daughter, Anna Eliza. There was some uncertainty as to who was the father of this child, but it was believed by John J. Weaver, not to be his child, but the child of one McFarland, who was also having illicit intercourse with the mother at the same time. She states, that it was McFarland's child. But from its early infancy, when not more than six months old, it was taken by John J. Weaver to his home, and she was there reared by him and his wife, till she attained the age of seventeen, when she married George A. Church. She was married by the name of Anna Eliza McFarland. About a year or eighteen months after the birth of this child, Anna Maria Weaver gave birth to another daughter, Maria Teresa. She was born at the home of John J. Weaver, and he always admitted, that she was his child. She never lived with John J. Wea-

ver, but with her mother and married about the same time that her sister did. She married Patrick Dower, and her name is stated in the marriage license to be Maria Teresa Weaver.

These marriages took place in 1867, and each of them met the approval of John J. Weaver. Shortly after their marriage in the autumn of 1868, John J. Weaver, having received a fall from a wagon by which he was injured, made his will whereby he gave all his property real and personal to his wife Angelina, for life, remainder to Maria Teresa Dower and Anna Eliza Church and their heirs, to be equally divided between them.

When he died July 15, 1876, he owned real estate worth from forty-five thousand to fifty thousand dollars; and personal estate from two thousand to three thousand dollars. John J. Weaver was a resolute man, and one whom it was difficult for any one to influence, when he had once made up his mind. He was an uneducated man, rarely writing more than the mere signing of his name. His wife Angelina knew of the contents of this will made in 1868, as did a number of other persons; John J. Weaver, frequently speaking to others of how he had by his will disposed of his property. His wife was never satisfied with it. She did not want Teresa Dower, to have any portion of the estate of her father John J. Weaver. She desired after her death, that it should go to Anna Eliza, afterwards Mrs. Church, who had been raised by her.

After the marriage of Maria Teresa to Patrick Dower, he kept a saloon. This his wife's father John J. Weaver, disapproved of; and on a number of occasions said, if he did not give up selling whisky he would furnish him with no more help, and he would not give his wife any of his property. He did give up keeping a saloon, but while John J. Weaver thus spoke, he did not destroy his will or make any change in it. But continued up to within two or three weeks of his death, to speak of this will as one that suited him, and one which he would not change. There is no direct evidence that his wife endeavored to use her influence with him, though it is proven, that she at one time asked a third person to use his influence with her husband to get him to change

this will.  If she did not make the effort to to get this will changed, before the few weeks preceding her husband's death, it must have been because she knew she could not influence him to change it for it is well proven, that she did not like the provision in it by which Maria Teresa Dower, was provided for, and that too equally with Ann Eliza Church, who had been raised by her.

In 1875 John J. Weaver, was afflicted with a cancer in his stomach, and about the close of this year this affliction was regarded as dangerous, threatening to destroy his life.  And from January 1, 1876, till his death on January 15, 1876, he was confined to his room and bed, and suffered great agony. Up to this time and even afterwards, he continued to speak of this will of 1868, as satisfactory to him and he sent for his daughter, Maria Teresa Dower, to come with her children to see him, which she did on three several occasions during his sickness.  The latest declaration by John J. Weaver, or his being satisfied with this will of 1868, was on January 5, 1876, when he so told his sister.  But about this time the physicians attending him, commenced administering to him morphine both in powders and hyperdermic injections.  The effect of this medicine was to relieve the intense pain from which he was suffering.  This cancer in his stomach also produced stupor and affected his mind.  To what extent his mind was affected by it and the taking of morphine, it is difficult to say; but within less than a week after he commenced taking it he signed a will, whereby he gave all his property to his wife for life, and after her death to Ann Eliza Church, the wife of George Church, and her children. The will making no mention of his daughter Maria Teresa Dower, to whom after the death of his wife, he gave one-half of his property by this will of 1868.  This will was dated January 9, 1876, and he died January 15, 1876, and the will was admitted to probate by the county court of Mason on January 24, 1876, having been presented by the executrix in it, his widow, and proved by the attesting witnesses J. C. Brinker, a nephew of the testator, and L. H. Bridgeman, the latter being the writer of the will.

On May 26, 1877, Teresa Dower and her husband Patrick Dower, and their six infant children instituted a chancery

suit in the circuit court of Mason county, against Ann Eliza
Church and her husband George Church, Angelina Seeds,
late Angelina Weaver, and her husband James M. Seeds,
she having married him after the death of her husband John
J. Weaver, and the four infant children of said Ann Eliza
Church and George Church. The object of this suit was to
have the paper dated January 9, 1876, and admitted to pro-
bate by the county court of Mason on January 24, 1876, as
the will of John J. Weaver, declared not to be his will, and
the probate thereof annulled, and the bill also asked, that the
will made in 1868 might be set up and established as the last
will and testament of John J. Weaver, and alleged that it
was lost or destroyed. All the defendants answer this bill;
the infants by their guardan *ad litem*. Angelina Seeds, ad-
mits the due execution of the will of 1868, and that its con-
tents were such as was stated in the bill; but she denies that
it was the last will of her husband John J. Weaver, but says
the will he executed on January 9, 1876, was his last will, and
that he was when he executed it competent to make his will
and that the will of 1868 was destroyed by his direction.
She also says "she never directly or indirectly in any way in-
fluenced, or tried to influence the mind of her said husband
in making or changing any will whatever by him, at any
time made. And, that she was at all times well satisfied to
let the will of her husband, whatever it might be, have its
effect in the final disposition of the estate after her death."

The answers of the other defendants, while they did not
deny the due and legal execution of the will of 1868 or its
contents as stated in the bill, did not admit the same, but
said they knew nothing of it and required full proof. And
they state, that the last will was made when the testator
was of sound mind and disposing memory. Some depositions
were taken to prove, that the said John J. Weaver, was not
of sound mind and disposing memory when the paper of
January 9, 1876, was executed; and the court then on this bill,
answers and replications to them, and these depositions, the
plaintiffs asking it, on October 16, 1877, decreed, "that an
issue be tried before a jury at the bar of this court to ascer-
tain, whether any and if any how much of the paper pro-
bated by the county court of Mason county, West Virginia,

on the 24th day of January, 1876, was the will of John J. Weaver, deceased."

Subsequent to this decree, some depositions were taken to prove the due execution of the will of 1868, and its contents. After these depositions were taken, on October 9, 1879, a jury was sworn to try this issue; the trial of the case lasted about a week, and on October 16, 1879, the jury rendered this verdict, " that the paper writing purporting to be the last will of John J. Weaver, deceased, and probated in the county court of Mason county, West Virginia, on the 24th day of Janury, 1876, was not nor was any part thereof the will of John J. Weaver, deceased." Affidavits of a number of persons were then filed by the defendants to show, that one of the jurors had misconducted himself; and counter affidavits of other parties were filed by the plaintiffs, to disprove this charge.

The affidavits prove, that pending the trial one of the jurors, while going on foot to a place a few miles from the court house, was overtaken by a stranger in a one-horse buggy; he invited him to get in the buggy with him, not knowing he was a juryman. The juryman got in the buggy with him and rode on his route about three miles. While thus traveling Dr. A. L. Knight, who had been a witness for the plaintiffs in this cause on the trial of the issue, overtook this buggy and drove along behind, both buggies being driven at a brisk trot. Dr. Knight was a stranger in the community, and did not know the juryman or, that the man in the other buggy was a juryman. Dr. Knight drove behind the buggy for a quarter or a half mile, and during that time he entered into a conversation with the stranger in the buggy before him; and during this conversation, Dr. Knight asked the stranger what he thought of the evidence in the will case ? The stranger said he had not heard all the evidence, and would like to have heard all that one witness, meaning him, had said. Dr. Knight said, he thought it strange they did not give J. J. Weaver, more than one dose of morphine on the 9th day of January, 1876, when days previous when he was there, more had been given. Dr. Knight then said something about one of the witnesses to this will stultifying himself, or contradicting himself. This

was all the conversation that occurred between the stranger and Dr. Knight. And no conversation occurred between the juror and Dr. Knight. The stranger says, the juror said to him, "that this witness spoken of wanted to come back and explain, but they would not let him, and that he had been contradicted by two witnesses. He also said, he thought he knew how the jury stood. To this, the stranger says he made no reply, as he was listening to Dr. Knight. He then asked the juror a question, which he does not remember, and he told him he was a juror. He replied, "the devil you are," and expressed the hope, that what he had said would not influence him. Nothing more was said.

The juror says, that all that he heard passing between the stranger and Dr. Knight, was he thought in reference to what one of the experts had said, but he did not fully understand what was said, and as soon as he was convinced they were talking about this trial, he told the stranger that he was a juror, and he said nothing more. Dr. Knight made a remark or two more, which the juror says he did not understand, and by that time he had reached the place where he wanted to quit the buggy and go across the fields to the place he was going to, and he did there quit the buggy. He says, "that the accidental hearing of these remarks did not make any impression on his mind, and did not influence him in the least in the rendering of the verdict."

One of the plaintiffs' counsel in his affidavit states, that pending the trial and before the case was submitted to the jury or they had retired, he went to one of the defendants' counsel having heard, that he knew something of some juror having talked to some one on the matters before the jury, and asked him the truth about the matter. He declined to let him know anything about it, saying he would learn it soon enough. The defendants' counsel referred to denies, that he ever had such a conversation or any conversation with this plaintiffs' counsel on this subject, but he admits, that on October 14, 1879, the day before this case was submitted to the jury, he heard of some conversation having occurred between this stranger, giving his name as Dr. Knight, and one of the jury, in regard to the evidence in the case. He told his informant, that he did not believe it, as these gentlemen were both men of honor.

On 15th of October, 1879, he saw this stranger, who told him all that had passed, except he told him he thought the juror's name was Rice. He examined the jury list and found no such name on the jury, and he did not know who the jury-man was till after the verdict was rendered. This information was also communicated to the other counsel for the defendant together with what was said, but the juror's name was given to him too as Rice.

On the 16th of October, the day after the case was submitted to the jury, this stranger pointed out the juryman to one of the defendants. One of the plaintiffs' counsel also stated, that the stranger in his presence and in the presence of the juryman stated, what had passed, and the juryman made no denial of it or any objection to his statement. One of the defendants George W. Church, also made an affidavit, that the duty devolved on him to prepare the cases for his wife and children, and since the verdict he had discovered two wit-nesses, who would have been very material witnesses for them at the trial. One of them would prove, that some three or four years before January 9, 1876, he heard J. J. Weaver say, "that Pat Dower had gone over to Antiquity against his wishes, and was selling whisky there; and he did not intend to give him or his wife anything. If he gave his wife any-thing it would be the same as giving it to Pat, as he would get it from her." This is substantially confirmed by the affi-davit of this witness, but he states he knew George W. Church intimately and had many dealings with him since 1868, and saw him frequently during the trial, as he was at-tending the court as a juror in another cause.

The other newly discovered witness, Blackmore, would prove, that he was a blacksmith living in Ohio, and on the 11th or 12th day of January, 1876, he went to John Weaver's house to collect a bill; that Weaver recognized him and rec-ollected the exact amount he owed him, and directed his wife to pay him, and that he would state he thought him of sound mind and disposing memory. He learned he could prove this by this witness too late to have him at the trial.

The evidence before the jury on the trial of that issue in this case proved all the facts I have hereinbefore stated.

The testimony as to the state of mind of John J. Weaver, on the 9th day of January, 1876, is very conflicting.

The physician in attendance on J. J. Weaver, at the time of his death proved, that he commenced attending him about December 15, 1875, and he died on January 15, 1876, of cancer of the stomach. Dr. Knight was called in as consulting physician, some two weeks or more before his death. After Dr. Knight's second visit, the regular physician concluded to give him morphia. We gave him about one-fifth of a grain and it seemed to do him good, and after that the treatment by morphia was continued. When he administered it, he did so by hyperdermic injection, and he left powders of about one-sixth of a grain each, to be given when necessary to allay the distress and burning in the stomach. He commenced this about ten or twelve days before his death. This would be from four to six days before the will was made. Some times two doses were given in the twenty-four hours, but generally one. No fixed times were prescribed for giving it, but it was to be given as required to ease pain. It produced calmness, quietness and cheerfulness. He staid all night at his house at his request on January 8th, and went into his room the morning of January 9th, about daylight. He told him then he wanted to change his will, and wanted him to write it. He said, that he had better get some one else, and he asked if one Mitchel would do and the doctor said he thought he would. He said then he would send Church for him. The doctor then gave him a dose of morphia of from one-sixth to one-fourth of a grain by hyperdermic injection. This was about a quarter past seven. He talked rationally, and he thought him then of sound and disposing mind and memory. He saw him that day about dusk. The doctor spoke to him about writing his will and he said he had had it written; that Mr. Bridgeman had written it for him. He knew of no morphia given that day, except what he had given in the morning, but the powders of morphia had been left with the usual directions. Mr. Binder was the nurse with whom he left powders to be given when needed. He gave rational answer that evening to the questions he asked, and he thought him then of sound mind and he continued so till three or four days before his death; that in his judgment the

morphia he gave in the morning, would not produce any aberration of mind at four o'clock in the evening. He left three or four morphia powders at a time, containing by estimation not weighed, a fourth or a fifth of a grain.

Cancer of the stomach principally affects the stomach, but also affects the brain. One-eighth of a grain of morphia might affect the breathing, but not cause stentorian breathing. The long continued use of it would produce perverted will power; but not in the doses and for the time it was given him. Dr. Knight on the other hand says, they misunderstood the disease till January 4, 1876, and then commenced administering morphine. He saw him again on January 8; he was getting weaker and weaker and he thought his disease fatal, and it was concluded to use morphine more freely. It was given to allay pain in the stomach. He again saw him on the 9th of January at eleven or twelve o'clock at night. He was convinced from his breathing that he was then sleeping from the effects of an anodyne; that both the disease and the treatment weakened both mind and body. It would not destroy the will power, but weaken and pervert it. If kept up for a length of time the mind would be easily influenced, and if the course of treatment prescribed had been carried out, in his opinion, he would not have been competent to make a will on January 9. He was convinced, that the disease was cancer of the stomach on January 8, though the attending physician did not think so then. But after his death a post mortem examination showed, that this was the disease. He never regarded a man with this disease and the treatment he was receiving, as of sound mind. The effects of a dose of morphine however administered of one-sixth of a grain, is supposed to pass away in from three to four hours. Dr. Barbee, as an expert proved, that morphia administered hyperdermically and by powders taken internally for four or five days, would tend to stupefy and weaken the intellectual powers.

According to the statement made by the attending physician, if no more morphia had been given than he stated, his opinion was it would not produce aberration of mind or want of will power when the will was made. Dr. Wm. Way stated, that cancer of the stomach exhausts the nervous sys-

tem, and affects the brain; and that the disease and this use of morphia would necessarily diminish the will power.

Mrs. Young proved, that she lived within two hundred yards of Mr. Weaver. She saw him on the evening of January 9, 1876. He asked if her son-in-law Mr. Bridgman, was at her home; and asked her to go over for him. She did so; when he came in his room he said, "I want you to write me a little will." He said any one could write a will; he only wanted a short one; and he wanted all he had written null and void. He then ordered a table to be brought and set by his bed, and told John Briggs, to get the paper and ink. He said he did not want her any longer and she then left the room; and every one else went out, but Bridgman. He was not drowsy and his conversation was rational. She did not introduce Bridgman to Mr. Weaver.

These statements were confirmed by Bridgman. He says, he dictated the parties to whom he desired his property to go, and the disposition he desired to be made of it. And it was drawn accordingly. He said he wanted his wife to keep the property together and for it to go to Church's children at her death. He said he wanted to make all former wills null and void. He named some of Mrs. Church's children, and the scribe says, he suggested she might have other children, and he said leave it to Mrs. Church and her children.

After the will was drawn he said, "have John Brinker come in and you and him witness it. Mr. Weaver, while discussing the witnessing of the will said, that the first will he had made was drawn by a lawyer at Point Pleasant; that another lawyer was called in to witness it, who wanted to read the will before signing it, and the writer of the will told him, that it was none of his business what was in the will; and all he wanted him to do was to witness the signature. He insisted on sitting up and signing the will, and gave as a reason, that he did not want it said he did not have the strength to sign a will; and he then sitting up signed it. And it was then signed by him and John Brinker, as witnesses in his presence and the presence of each other. When he started the will, the writer spoke of its being Sunday and Mr. Weaver smiled and said, that would make no difference; and said he once sued on a note dated on Sunday and recov-

ered the amount. He told him to keep the will in his possession until called for, and he did so till it was admitted to probate.

John Brinker, the other witness to this will, was a nephew of Mr. Weaver and attended on him for three or four weeks before his death, and gave him his medicines. He was dressed every day up to within three days of his death, and was out in the yard three days before his death. He gave Mr. Weaver no medicine on the 9th of January. He was somewhat drowsy the fore part of that day, but not after three o'clock. Church had gone after Mr. Mitchel, and he was not at home. He makes substantially the same statement as Mrs. Young and Bridgman, as to what occurred before they all left the room but Bridgman. He was called back in about fifteen minutes. He said he was not a fit witness, as he was a relative. Mr. Weaver said, that made no difference; that he would do as well as anybody. He gives the same statement as Bridgman, about signing the will and in nearly the same language, and makes a like statement about what Mr. Weaver said, about Sunday; that on that evening Mr. Weaver told him to wind up the clock, that he Weaver was in the habit of winding up the clock on Sunday evening. The witness wound the clock with two turns of the key; and Mr. Weaver told him to give it two turns more, which he did and Mr. Weaver said, that will do and then he stopped. He denied telling Henry Rausch, that the will could be broken and was not finished, or telling Sallie Knapp, Mr. Weaver's sister, that he did not hear the will read and did not know what it was. He said no morphine powders were to his knowledge administered to Mr. Weaver, that day though they were there lying on the table.

These witnesses and John Briggs all testify, that the testator was in their opinion of sound mind and disposing memory. John Brinker, one of the attesting witnesses, also proved, that Mr. Weaver told him just before or just after this will was written, that he never intended to give Pat Dower or his wife anything, and he did not know what they were hanging around there for. But it was proven by Raush, that he said after Mr. Weaver dies, we heirs will try and break this will. Two other witnesses also proved,

that he said that his aunt Mrs. Weaver, would find this will business the worst day's work she ever done. Mrs. Weaver, now Mrs. Angelina Seeds, in her deposition proves, that her husband J. J. Weaver was confined to his bed for ten days before his death. Heard him tell Church about noon January 9, 1868, he wanted to make another will, and asked him to go after Mr. Mitchel to write it. He went and on his return, told him he was not at home. Mr. Weaver said to him, never mind the doctor will be here directly and he can write it.. She makes then the same statement about what passed between Mrs. Weaver and Mrs. Young, that she does. After the will was wrttten she told her of it and told her to burn the old will, which she did two or three days afterwards. He never spoke to her about his will till that day. She was satisfied she said with the will he had made in 1868, and never in any way influenced him to have another. They also proved by another witness, that in 1875 Mr. Weaver said Church's children would get all his property.

In opposition to these detailed statements which go strongly to show, that J. J. Weaver was of sound mind and disposing memory on January 9, 1876, there are the statements of numerous witnesses, who represent his condition that day as so different, that the jury could hardly credit these statements, at least in all their details, without discrediting the statements of numerous other witnesses. W. E. Pavell says, that he saw him at two o'clock on Sunday, the 9th day of January, 1876, and he was then evidently delirious and unconscious. He could not answer a question intelligibly. At three or four o'clock, he was quiet in body and mind and conscious; he then seemed rational. This was the only time he ever visited him. Charles Gilkins who lived on the farm then says, he saw him almost every day except on the 9th of January, 1876, when he was told by Briggs and also by Church, the defendant, that he was too sick to be seen. He says, he was not capable of doing business that day he should suppose, judging from what he saw of his condition the day before and the day afterwards, as he was very drowsy and dull.

C. E. Gilkin testified, he saw him on the 9th day of January, 1876, He was flighty, out of his head, and in a great

deal of misery; he was that way all day; they said he was dying. He was there in the afternoon, and that was his condition then. This was a youth about nineteen years old. He states this to have been his condition an hour before the will was written, as well as shortly after. Capt. D. O. Hopkins saw him twice on the 9th of January. On both occasions he was breathing very hard and looking very badly, and seemed much prostrated. He regarded him as at the point of death and on the last occasion asked him, if he knew him. He could not understand the answer, but was told that he said: "Is it Capt. David Hopkins?" He had known him well for forty years. He did not regard him as competent that day to do business. He could not have dictated a will. He seemed to be under the influence of morphine, and his answers were not correct. He would swoon away while the minister was talking to him. Mrs. Weaver said he was under the influence of morphine.

Drucinda Raush saw him at half-past two o'clock, on the 9th of January. He was lying on his bed asleep or dying; Mrs. Weaver said it was not natural sleep, it was from medicine. He awoke once and said, "Oh God!" She staid there two hours till half-past four, he was still asleep or in a stupor and was in her opinion then incompetent to do business; this was about a half hour before the will was written. He was breathing very hard; Mrs. Long felt his hands, and Mrs. Weaver his feet and said they were warm. No one then seemed to think he was dying.

R. Graham proved, that he did not see him on the 9th of January. He went to see him that day; was told, that he could not see him; that noise would disturb him, and that they were going to make a will. He saw him on Monday, the next day, and he was not then able to do any business, and was not from that time till his death.

Hamilton Weaver was there on the porch, when the will was drawn and went into Mr. Weaver's room directly afterwards. He was lying on his bed asleep most of the time he was there. He said something he could not understand. John Brinker the witness to the will said, that what he said was, "that they had given him too big a dose and it made him stupid." He would have gone in sooner, but George A.

Church, said he would rather he would not go in as they were doing some writing. Henry Rush, who lived there stated, that on Monday, the day after the will was written, he breathed very hard and had a nervous twitching; he would sometimes recognize him and sometimes not. He was in very poor condition and so remained, till his death; he waited on him.

Joseph Elliott lived in sight of him, and had known him all his life. He was he says, in the room when Bridgman came in to write the will. Mr. Weaver did not seem to recognize him. The witness judged he was under the influence of medicine, and was suffering a great deal. He heard him muttering, but could not understand what he said; he did not seem able to talk so as to be understood, and this was his condition before and after the will was made. He did not think he was then rational. When he left the room with Mrs. Young, George A. Church, as well as John Brinker, staid in the room; that whether they afterwards went out he did not know. That not long after, he and others wanted to go in; Mrs. Church was in the room and asked them not to come in. He saw through an opening of the curtain, while Bridgman was drawing the will. He got up and shook Mr. Weaver to arouse him. John Brinker was in the room then, and probably Church; he then left the window and saw no more.

Angelina Seeds, who was J. L. Weaver's wife, gives nearly the same statement about what occurred in the room, that Bridgman and Mrs. Young did, first to their all going out except Bridgman, who remained to write the will. She says, when she came back he said to her, Mama I have made another will; Mr. Bridgman has got it; he will give it to you. She asked him what he was going to do with the other one; he said burn it up, burn it up; and she did so several days afterwards. She denies, that she ever had any conversation with her husband about his will, or ever heard anything about it, till the day he made it. She says, she never in any way tried to influence him in making his will, and was satisfied with the will he made in 1868. There is however, an abundance of testimony in the cause to establish as a fact, that she was not and never had been satisfied with

this will made in 1868, and frequently said she wanted it changed, and Teresa Dower left nothing.

A number of depositions were made and exceptions taken, to the reading of certain questions and answers in them; some of which were sustained and others overruled. So far as it is necessary these objections will be noticed in the opinion.

The defendants asked a new trial of the issue, on the ground of newly discovered evidence; because of the misconduct of a juror and on the ground, that it was contrary to the law and the evidence and further, that illegal and incompetent evidence was allowed to go to the jury. But the court overruled the motion, and a bill of exceptions was taken, in which all the evidence is certified and is substantially given above. And the defendants on October 28, 1877, also moved the court to set aside the order, directing the issue as improperly and improvidently awarded, which the court refused to do; and on the 1st day of November, 1879, entered a decree in pursuance of the said verdict and decreed, that the paper writing purporting to be the last will and testament of John J. Weaver, deceased, and probated in the county court of Mason county, West Virginia, on the 24th day of January, 1876, was and is not, nor is any part thereof the will of John J. Weaver, deceased; and the said order probating said will was set aside, annulled and held for naught. From this decree the defendants have appealed to this Court.

GREEN, JUDGE, announced the opinion of the Court:

The first question presented by this record is, whether the circuit court did not err in ordering the issue of *devisavit vel non*, and in entering up a decree based on the verdict of the jury on this issue; because before the ordering of the issue by the court the plaintiffs had not shown, that they were interested in the question, whether the paper dated January 9, 1876, and admitted to probate by the county court of Mason, on the 20th of January, 1876, as the will of John J. Weaver, was or was not his will. This suit was instituted under section 28 chapter 78, of the Code of West Virginia, page 483, which provides, that "after a sentence or order (admitting to probate or refusing to admit to probate, a paper as a will), a person interested, who was not a party to the

proceeding, may, within five years proceed by bill in equity to impeach or establish the will, on which bill, if required by either party, a trial by jury shall be ordered, to ascertain whether any and if any, how much, of what was so offered for. probate, be the will of the decedent. If no such bill be filed within that time the sentence or order shall be forever binding."

Neither the plaintiffs in this suit nor the heirs or distributees of the decedent, John J. Weaver, were parties to the proceedings in the county court of Mason, whereby on January 24, 1876, the paper dated January 9, 1876, was admitted to probate as his will. But it is claimed, that the plaintiffs in this cause before the ordering of the issue wholly failed to prove, that they or any of them were persons interested, and therefore under the provisions of law above quoted they had no right to bring this suit in equity to impeach this will of January 9, 1876, and the court ought not to have directed the issue of *devisavit vel non*, nor entered up a decree in accordance with the verdict of the jury, "that said paper writing purporting to be the last will and testament of John J. Weaver, deceased, and probated in the county court of Mason county on the 24th day of January, 1876, was and is not, nor was nor is any part thereof, the will of John J. Weaver, deceased;" and further, that the order probating the same ought to have been set aside, annulled and held for naught.

The question whether the circuit court did right in thus acting as though the plaintiffs in this cause were persons interested, and having a right to such an issue of *devisavit vel non* under this statute, depends for its true solution on the real character of such a suit instituted under this section.

In Virginia they have had and still have a statute, similar to our statute above quoted; and their courts have determined the character of the suit instituted under it, and what can be done by the court in such a suit. Baldwin, Judge, in *Malone's Adm'r et al.* v. *Hobbs et al.*, 1 Rob. 388; after quoting the Virginia statute says, "that the statute provides a supplemental tribunal to revise the decision of the court of probate, if in favor of the will; and that tribunal is a jury, to be impaneled for trial of the issue of *devisavit vel non*, to be directed by a court of chancery. The jurisdiction, such as it is, so conferred on

the chancery courts, is no part of the original jurisdition of the courts of equity, which will not (in the language of the books) in an adversary way, take jurisdiction to determine the validity of a will.   It is a probate jurisdiction to be exercised not by the chancellor, but by the jury; and its only power, is to convene the proper parties, and to cause the prescribed issue to be made up and tried, with the incidental power to grant a new trial, and to remove impediments and furnish facilities to a full and fair trial of the merits before the jury.   The issue is directed by the mandate of the court, in order to the final probate of the will propounded; and not to inform the conscience of the chancellor, whose conscience is not at all concerned in the matter except to prevent injustice being done by the verdict of the jury.  The issue is not made up by the bill, answer and other pleadings in the chancery proceedings, but is a new and separate issue   *   *   When the jury are impanelled upon the issue, the parties are then in a legal forum, which looks only to the question which the jury have been sworn to try, without regard to the chancery pleadings.   These proceedings cannot enlarge or contract the issue before the jury.

The conclusion reached in this case from this reasoning is, that the bill need not set out as fully the facts on which the plaintiff claims, that the paper which has been probated as the will, is not the will of the decedent, as it would have to do under the general rules governing equity pleadings; but that it will suffice in such a bill to aver in general terms, that the writing of which probate has been received is not the will of decedent."

The general principles here expressed were acted upon in *Coalter's Ex'r et al.* v. *Bryan and wife et al.*, 1 Gratt. 18.  In this case the bill was filed, not only to contest the validity of a will, which had been regularly admitted to probate; but also that the executor and others who had possessed themselves of the estate of the decedent under the will, should account for the same to those entitled to it.   The circuit court dismissed the bill as to the executor, and refused to require or permit him or others, to render any account in this suit of the estate which had come into their hands.   This was approved by the court of appeals which held, "that the function

of such a suit was exhausted, when the question whether the will was valid or invalid, was decided."

Upon this subject Judge Baldwin says, on page 80, "the most that can be said in behalf of the ulterior relief sought by the plaintiff is, that the court of chancery having obtained jurisdiction of the subject, for the purpose of deciding on the validity of the instrument, it ought to go on to administer complete justice between the parties, instead of turning them around to another action whether in the same or a different forum. But this is founded on the supposition, that the court of chancery has obtained jurisdiction of the subject as a court of equity. Such however is not the fact; its jurisdiction is merely that of probate; and to be exercised not by the court but by a jury under its supervision, and for the decision of a common law issue affecting the legal rights of the parties. Besides, the ulterior jurisdiction claimed for the court of chancery, is not founded upon the circumstances existing at the institution of the suit, but merely prospective and contingent."

In the case now before us for example the question, whether the paper executed in 1868 was the will of the decedent, could not properly arise till it has been first decided, that the paper executed in 1876, was not the will of the decedent. That is till this suit proper was terminated.

These views are again approved in *Lamberts* v. *Cooper's Ex'ors et al.*, 29 Gratt. 66; in which it was held, that the mode of proceeding upon the trial of an issue of *devisavit vel non*, is substantially the same as in the trial of common law actions. Bills of exceptions are taken in like manner, and a new trial awarded or refused by the court on the same principles, which would govern a common law court in granting or refusing such new trial. And this Court, on appeal from the circuit court, in refusing to grant such new trial, would be governed by the same principles, that would govern them in a writ of error to a judgment in a common law suit, refusing to grant a new trial.

These views, may be perhaps regarded as to some extent, qualified by the decision in *Connolly* v. *Connolly et al.*, 32 Gratt. p. 657; it is there held, that "a court in which, a bill is filed under the statute to impeach or establish a will is not

a mere court of probate, but something more. It is a court of equity, and though its powers over the subject confided to it are limited it may on a proper bill, review or correct errors in its proceedings upon final decree in the cause." But Moncure, President, dissented from the opinion and decision in this case. This case also decided, that a decree establishing or rejecting a bill in a case of this description, so long as it remains in force, binds conclusively not only the immediate parties to the proceeding in which such decree is rendered, but all other persons and all other courts.

But it was decided in this case, as in the case of *Singleton* v. *Singleton et al.*, 8 B. Monroe 340, 345; "that if in such a chancery suit the jury on the issue of *devisavit vel non* should find that the paper writing purporting to be the will of the testator, was not the will of the testator, a legatee or devisee in such supposed will, who was not made a party in the chancery suit, could file a bill in the nature of a bill of review to review the decree adjudging, that such paper was not the will of the decedent, and have the issue again tried; or if he was an heir or distributee who had not been made a party, and the decree was in favor of the will, such heir or devisee could have the case reviewed by a bill in the nature of a bill of review, and the issue of *devisavit vel non* again tried." But in the case of *Connolly* v. *Connolly et al.*, the majority of the court expressly approve the Virginia cases I have cited; but they regard the language used by the judges rather too general, in speaking of the chancery court in such cases as only a court of probate.

From these decisions it seems to me clear, that the court in this case directed the proper issue to be tried, that is, " to ascertain whether any, and if any, how much of the paper probated in the county court of Mason county, West Virginia, on the 24th day of January, 1876, was the will of John J. Weaver deceased." This is the issue which the statute required to be tried by the jury. And it can as we have seen, neither be enlarged or restricted by the pleadings in this case. It would have been an error in the circuit court to have directed the trial of such an issue, as the appellants now in this Court insist it should have directed; that is, "how much if any of the two instruments named in the

bill as executed by John J. Weaver, was and is his will." As we have seen, the court had no authority in that case, to do more than to have determined by a jury under its supervision, the single question whether the paper, which had been probated was or was not the will of the deceased; and then to render its decision accordingly.

. But it is claimed, that it had no authority to direct such an issue, till the plaintiffs had proved themselves interested in the question by proving the will of 1868, under which they claimed. This is a strange position. If they had been required to prove this it would obviously have been the duty of the court, at the instance of any of the parties, to have proved it in the manner, which the law requires; that is by a verdict of a jury that the will of J. J. Weaver of 1868, was made when he was of disposing mind and memory, and was executed and witnessed in the manner required by law. And thus instead of only one question to be decided by the jury, under the direction of the court as required by the statute, another question of like character and difficulty, would have to be decided in like manner by a jury and the court. This would be as we have seen, an obvious violation of the statute.

But it may be asked, can any one by setting up a pretended claim in the bill utterly unfounded, contest in this way any will, though the plaintiffs have no real interest in the question, whether it be or be not the will of the decedent ?

I answer they cannot; for at the instance of the defendants, the court would issue a rule against the plaintiffs to show cause why their bill should not be dismissed, because they were abusing the process of the court in a matter in which they had no *bona fide* claim of or to any interest. And if on the trial of such rule by the court without any intervention of a jury it appeared, that the plaintiffs had no claim or pretense of claim, to any interest in the subject of controversy named in the bill, then their suit would be dismissed.

But the enquiry in this case on such a rule would not have been, whether John J. Weaver was competent in 1868, to make a will and did make such a will, as stated in the bill, but simply whether the plaintiff set up a *bona fide* claim, that such a will had been made. On such a rule in this case, the affidavit of the widow of John J. Weaver, to the facts stated

in her answer would alone have been ample to prove, that the claim of the plaintiffs to an interest in the question in controversy in the cause, was obviously *bona fide*; and the rule would have been dismissed.

The next enquiry is, should this Court reverse the decree of the circuit court of November 1, 1879, because the issue had been prematurely and improperly awarded, as the heirs of John J. Weaver, had not been made parties to the cause? They were certainly interested in the question, and ought properly to have been parties. Their proper position in the cause was that of plaintiffs; but as one at least of them could not have occupied such a position, he being a witness to the will, he or any other of them who refused to join as plaintiffs, should have been made defendants. So that all interested should be finally bound by the decree of the court in the case.

Not being parties they would not have been finally bound by a decree setting up this as the last will of John J. Weaver, but could after that have filed a bill in the nature of a bill of review, as a review of the case and have obtained another trial of the same issue by a jury. Though they would have been bound by such a decree as *res adjudicata*, till and unless it was thus reviewed and set aside. See *Connolly* v. *Connolly et al.*, 32 Gratt. 657 and *Singleton* v. *Singleton et al.*, 8 B. Monroe 340. But the reasons assigned in these cases for allowing a new trial of this issue to such heirs, if the first verdict and decree had been against their interest show, that no such new trial would for such reason be granted to the devisees in the will, if the jury found against them and they were parties to the suit as in this case.

Judge Burk, in delivering the opinion of the court in the Virginia case, 32 Gratt. p. 666, says: "Is it possible that the law provides no remedy; gives no relief in such a case. Are parties to be forever barred of their rights without being heard or having an opportunity of being heard?" We think not. As is said by Judge Christian, in *Underwood* v. *McVeigh*, 23 Gratt. 409, 418, "it is of the very foundations of justice, that every person who is to be affected by an adjudication should have the opportunity of being heard in his

defense." Or as Chief Justice Marshall said in the Kentucky case, 8 B. Monroe 345, 346: "We take it to be an indisputable principle, essentially inherent in every enlightened system of jurisprudence, that every person who is bound by a proceeding to which he is no party, and had no opportunity of becoming a party or of making a defense, and in which he is unrepresented must, if he had such interest in the subject as required or authorized him to to be made a party, be entitled to some mode of reviewing the same." See also *Renick* v. *Ludington,* 20 W. Va. p. 511.

But as the defendants have had "the opportunity of being heard in their defense," by such reviewing they ought not to be again permitted to try this issue over. They have already fully availed themselves of this opportunity, being represented by able counsel in the trial of this issue, which lasted six days. If they had wished to bind the heirs of J. J. Weaver, by the decision in this cause, they should have demurred to the bill or in their answers should have claimed, that they should be made parties to the cause before the issue of *devisavit vel non* was tried. They did neither, because I presume they felt satisfied, that if this was found to be the true last will of John J. Weaver, that his heirs would abide by the result.

The want of proper parties is always a good ground of demurrer, and it has been frequently laid down by the courts in very broad language, "that all persons materially interested in the subject of controversy ought to be made parties in equity; and if they are not the defect may be taken advantage of by demurrer or *by the court at the hearing.*" And also, "that where such defect is apparent on the face of the records, although the bill can not be demurred to in the court below nor the defect noticed by the court at the hearing, it will be noticed by the court at the hearing in the appellate court and the decree reversed for that cause. See *Dabney* v. *Preston's Adm'r,* 25 Gratt. 841; *Armintraut* v. *Gibbons,* 25 Gratt. 371; *Sillings* v. *Bumgardner,* 9 Gratt. 273, 275; *Richardson's Ex'or* v. *Hunt,* 2 Munf. 148; *Sheppard's Ex'or* v. *Starke and wife,* 3 Munf. 29; *McCoy's Ex'or* v. *McCoy's Devisees,* 9 W. Va. 443; *Lyman* v. *Thompson,* 11 W. Va. 427.

But these propositions are certainly not universally true.

It is certainly a very important principle of a court of *equity*, that it ought not to dispose of any case by settling its principles or rendering a final decree in it, when any party materially interested in the subject of controversy is not before the court. This is a fundamental principle in courts of equity, and its observance is generally essential in order to avoid great trouble as well as to administer justice with uniformity, and to avoid conflicting decisions.

The necessity for the observance of this principle to avoid such confusion, injustice and delay, is well illustrated by the case of *Renick* v. *Luddington*, 20 W. Va. 511. But nevertheless, the principle is not of universal application; in that very case this Court did not apply it to its full extent. They did not reverse in *toto* decrees rendered by the court below, though persons who were interested in the subject-matter had not been, as they ought to have been made parties defendants. No demurrer had been filed in this cause on this account, nor had any objection been made by reason of this defect at the hearing; yet this Court did not reverse in *toto* the decrees of the court below, but only reversed such portion of these decrees as were prejudicial to the interest of those persons, who had not, but ought to have been made parties defendant. So too in *Swann* v. *Seldon*, and unreported case cited in *Kincheloe* v. *Kincheloe*, 11 Leigh 398; the court decided, that the decree dismissing the bill on the merits ought not to be reversed on an appeal taken by the plaintiff merely on the ground, that persons interested in the subject of controversy were not made parties. This decision was followed by this Court in *Mitchell* v. *Chancellor*, 14 W. Va. 22. See also *Jameson's Adm'r* v. *Deshields*, 3 Gratt. 13. Perhaps the ground of this decision was, that the appellant the plaintiff, was not prejudiced by the decree; it being right on the merits of the case. See *Vance* v. *McLaughlin's Adm'r*, 8 Gratt. 289. But some courts have gone further. Thus in *Chambers* v. *Robbins*, 28 Conn. 555, the court say, "Again it is said this case ought to stand over, that Mills and wife might be brought in and made parties to it. It may be admitted this would have been the proper course if the suggestion had been made at the proper stage of the proceedings. But no such objections appear to have

been made in the superior court, and we think it is too late now to take it by way of suggestion and argument in this Court. No decree is asked against them, and their rights are such as do not affect the defendant. They are in a position antagonistic to the defendant, and not being parties their own rights are preserved, and if the defendant wished the controversy settled in respect to them, he might at an earlier day have caused them to be brought before the court. It does not appear to us that the purposes of justice will be subserved by postponing the case for want of parties." See also *Furguson* v. *Fish,* 28 Conn. 501.

Some of these cases and especially the two last, it may be difficult to reconcile with the other cases we have cited, laying down the general principles we have stated. But we apprehend, that to these general principles which are sound, it will be found there are some exceptions, which it may be difficult to define. And we do not deem it necessary for reasons we will presently state, that it should be done by us in this case.

In the case of *Kincheloe* v. *Kincheloe,* 11 Leigh 398, the suit was one similar to the one before us; the jury however rendered a verdict in favor of the will, but the plaintiff as in this case had failed to make the proper parties to the suit, and the court below thereupon after the verdict had been rendered, instead of entering a decree in accordance with the verdict, dismissed the bill for want of the proper parties defendant. The court of appeals were of opinion, that if the verdict had been a proper one such as on its merits ought not to have been set aside, the court below ought to have entered up a decree in accordance with it; but as the court below had improperly excluded certain evidence, the appellate court set aside the verdict and remanded the cause for further proceedings; directing the proper parties to be made defendants.

In this opinion Judges Cabell and Stanard concurred. Judge Tucker dissented; being of opinion, that even if the verdict of the jury had been unexceptionable, no decree could have been rendered in accordance with it, because of the absence of the proper parties; they not having been made defendants. He says page 400, "No decree could properly be pronounced affirming the validity of a will, unless all persons concerned in interest were before the court. For the

will can not be good against one and void as to others.   Nor can a verdict and decree against one bind the others.   The other heirs might therefore file their bills, and on the trial of the issue it might be found against the will.   If so the will would be void as to them and good against the defendant in this suit.   This cannot be."

This reasoning is unsound in this, that Judge Tucker assumes, that while such a decree was in force the heirs who had not been made parties, would for that reason not be pound by the decree affirming the will, and admitting it to probate. This is clearly not so.   The admitting a will to probate is a judgment *in rem*, and while the order admitting it to probate is unreversed it is binding on all parties, whether parties to the proceeding by which it was admitted to probate or not.   See *Wills* v. *Spraggins*, 5 Gratt. 555 and *Connolly* v. *Connolly*, 32 Gratt. p. 657.

In this respect as in many others a suit in equity to set aside the probate of a will, differs most essentially from other suits in equity; for it is unquestionable, that in ordinary suits in equity a decree of the court is not binding on persons, who ought to have been but who were not, parties to the cause.   And Judge Tucker fell into the error of supposing, that this rule applied also to suits to set aside the probate of a will; but it clearly does not.   Still according to the case of *Connolly* v. *Connolly*, 32 Gratt. 657 the persons who were not made praties to the cause are not without a remedy in such a case, for they have a right to file a bill in chancery in the nature of a bill of review, and in it have the issue of *devisavit vel non* tried again, making all the proper parties to the suit.   And if the verdict of the jury on the issue of *devisavit vel non*, should be different from the former verdict of the jury, the court may enter up a decree setting aside and reversing its former decree, and rendering a new decree in accordance with the last verdict of the jury.

It does not however seem to me, that Judges Cabell and Stanard, based their opinion in *Kincheloe* v. *Kincheloe*, 11 Leigh 398, on as solid ground as it might have been based; for they evidently did not draw the distinction we have referred to between a chancery cause to set aside the probate of a will, and other chancery causes.   The truth is, that a

chancery cause to set aside the probate of a will, has but very little resemblance in many respects to an ordinary chancery suit. And the rules which govern the proceedings in it, are generally very different from those governing the proceedings in other chancery causes. Thus we have seen, that the rule universally applied in other chancery causes, that the chancery court having taken jurisdiction properly of the cause will proceed to do complete justice to the parties, and will not turn them over to another suit either at common law, or in chancery, has no sort of application to a chancery suit brought to set aside the probate of a will. So too the rules, which govern in setting aside the verdict of a jury in the trial of ordinary issues out of chancery, are not applied to the issue of *devisavit vel non,* ordered in a suit brought to set aside the probate of a will. On the contrary in such suits, the rules which govern courts of common law in the trial of actions at law, are applied in such a case. In fact a chancery cause to set aside the probate of a will, in most respects, is conducted like a common law suit. The issue tried is to settle the *legal* rights of parties, and it is only tried under the supervision of a chancellor. This supervision of the jury is all he has to do in the cause. If the verdict of the jury on common law principles is right, he must enter up his decree in accordance with such verdict. Now there is no such rule of common law, that every person materially interested in the subject of the controversy, must be made a party to a common law suit; nor will the court dismiss the case unless all such persons are made parties. After the verdict of a jury too, in a common law case, judgment will be very generally rendered pursuant to the verdict, though the declaration was liable to demurrer. The rendition of the verdict cures almost all preceding defects.

These are the rules, which after the rendition of a verdict on an issue of *devisavit vel non* should govern, rather than the rules which govern in ordinary chancery suits. Before the rendition of such verdict, the parties may by demurrer or otherwise object, because proper parties have not been made, or because the bill is for any reason bad. But as in a common law suit such objections come too late after a verdict; so it does in a chancery suit of this character. This differ-

ence between ordinary chancery suits and a suit of the character of the one before us must be preserved, because in an ordinary chancery suit only the parties to the cause, or those who should be made parties are concerned. But it is far otherwise in the probate of a will or a decree pronouncing, that a decedent dies intestate. A very large number of persons have a deep interest in this question besides the immediate devisee and heirs of the decedent. The general public have an interest. They must know with whom to deal as the representative of the estate, whether the executor under the supposed will, or an administrator. It is important to the general public, that this question should be speedily decided, and when decided it should not be liable to be changed except by a review of the very decision by which it was decided. This is the spirit of our law and our decisions, and in accordance with this spirit the verdict of a jury on an issue *devisavit vel non* and a decree based upon such verdict ought not to be set aside and reversed by the appellate court, merely because there was an omission to make all the proper parties defendants in the court below, if no objection was made in the court below on that account, till after the rendition of the verdict.

Ought the verdict of the jury to have been set aside, because of the alleged misconduct of a juror in listening to, or engaging with others in conversations concerning the evidence and witnesses in the case, pending the trial of the issue. There is no allegation, that any of the plaintiffs or any friend of theirs, with a view of promoting their interest in any way, interfered with any juror. If such allegation had been made, it would justly have given rise to such a suspicion of foul play, that it could hardly be resisted. If the party in whose interest a verdict is found, or any one with the object apparently of promoting this interest, whether asked to do so or not, approaches the jury unfairly, their verdict will be set aside without looking into the merits of the verdict. Public policy as well as private justice demands this. See *Perkins* v. *Knight,* 4 N. H. 474; *Ritchie* v. *Holbrooke,* 7 Serg. & R. 458; *State* v. *Hascall,* 6 N. H. 352; *Knight* v. *The Inhabitants of Freeport,* 13 Mass. 218; *Cohen* v. *Robert,* 1 Stub. 210; *Coster* v. *Merest,* 3 Brod. & Bing. 272. But mere casual conversations with a third person about the case

by a juror, without the knowledge or connivance of a party to the case will not *per se* be sufficient to induce the court to award a new trial. To justify the court in so doing in such a case, there must be a manifest tendency in what has been said to influence the juror to the prejudice of the party, who seeks to set aside the verdict. See *Grinnell* v. *Phillips*, 1 Mass. 530; *People* v. *Boggs*, 20 Ca. 433; *Jackson* v. *Jackson*, 32 Ga. 325; *Nelson* v. *State*, 21 Miss. 500; *Perkins* v. *Knight*, 2 N. H. 474; *Blain* v. *Chambers*, 1 Serg. & R. 169; *Stewart* v. *Small*, 5 Miss. 525.

But even when the conduct of a juror is such, that the court would set aside the verdict, if this is known to the party or his counsel, who seek to set aside the verdict before the jury retired to consider of their verdict, and he fails to disclose it to the court till after the verdict is rendered, he thereby waives all objection on this account to the verdict, which may be rendered. And the court will not disturb the verdict for this reason on his motion. See *Pettibone* v. *Phelps*, 13 Conn. 445; *Stewart* v. *Small*, 5 Miss. 525; *Fessenden* v. *Sager*, 53 Me. 531; *Jackson* v. *Jackson*, 32 Ga. 325; *Martin* v. *Tidwell*, 36 Gro. 332; *Herbert* v. *Shaw*, 11 Md. 118; *Brunskill* v. *Giles*, 9 Bing. 13. There was evidently no manifest tendency in what Dr. Knight said to the stranger, in the presence of the juror to influence the juror, as what was said by Dr. Knight, was said under circumstances that made it very probable that it would have been very imperfectly understood by the juror. For the parties carrying it on were in two different buggies, the one behind the other, and both traveling at a lively trot. It is not probable, that one in the buggy not engaged in such conversation would either hear distinctly, or understand such a conversation. What the juror said to the stranger in the buggy, amounted to but little, except, that it showed that he the juror was guilty of misconduct. But even if this misconduct would have justified the court in setting aside the verdict, it could not properly do so, for the reason, that in this case it was admitted, that the counsel for the defendants knew of this conversation of the juror and these parties, before the case was submitted to the jury; and if they objected to it they should have called the attention of the court to it, before the jury retired. They could not take

the chances of a verdict in their favor, and then when disappointed in this, get the verdict set aside for an objection to the jury on their part, known to them before the jury retired.

It is true the defendants' attorneys did not know which one of the jury had heard this conversation. The party holding the conversation not hearing correctly the juror's name. But he could have pointed out the juror in the box if called on to do so, with the same facility that he did after the verdict was rendered. So that this furnishes the defendant with no excuse for failing to call the attention of the court to the matter, before the jury retired. The fair inference to be drawn is, that the defendants' attorney after hearing all had that passed with this juror concluded, that he was unprejudiced, and that they would therefore make no objection to him, or call the court's attention to the matter.

The next enquiry is, ought the court to have set aside the verdict because of the after-discovered evidence? This Court has repeatedly determined under what circumstances a court of law or equity, ought to award a new trial for after-discovered evidence. These principles are to be found in the following cases, among others: *Lucas* v. *Locke*, 11 W. Va. 81; *State of West Virginia* v. *Betsall*, 11 W. Va. p. 703; *Zickefoose* v. *Kuykendall*, 12 W. Va. p. 23; *State of West Va.* v. *Williams*, 14 W. Va. 851; *Sayre* v. *King*, 17 W. Va. p. 562; *Kimmins* v. *Wilson*, 8 W. Va. 584; *Roderick* v. *Rail Road Co.*, 7 W. Va. 54; *Snider* v. *Myers*, 3 W. Va. 195; *Bates* v. *The State*, 3 W. Va. 685; *Lewis et al.* v. *McMullin*, 5 W. Va. 582; *Gillilan* v. *Ludington*, 6 W. Va. 128; *Strader et al.* v. *Goff et al.*, 6 W. Va. 257. Among these principles we find there: First, that the evidence must be such, as reasonable diligence on the part of the party asking it, could not have secured at the former trial; second, it must be material to its object, and not merely cumulative, corroborative or collateral; third, it must be such as ought to produce on another trial important results on its merits.

The newly discovered evidence in this case fails to come up to these requirements. The defendant Church, with reference to the testimony of Hill says, he will prove that some three or four years before January 9, 1876, the date of the will, that John J. Weaver told him, that Pat Dower had

gone over to Antiquity against his wishes, and was selling whisky there, and that he did not intend to give Pat Dower or his wife, anything; that it would be the same as giving it to Pat, as he would get it from her. This was merely cumulative evidence; several witnesses having testified to Mrs. Weaver's having at different times said the same thing, or something very similar to it. And it ought not to produce on another trial an opposite result, for the weight of the evidence is, that while he did say this frequently, yet from the time he made the first will in 1868, up to within ten days of his death he often declared, that he would dispose of his property as that will did; that is give half of it to his daughter, the wife of Patrick Dower, after his own wife's death, and that he did not wish to alter, and would not alter this will of 1868.

The witness Hall, too proved, that he knew Church well, had been attending the trial of the case being a juror in other cases, and saw Church often during the trial. And under these circumstances, reasonable diligence it seems to me, would have enabled the defendant Church to have discovered this evidence before the case was submitted to the jury. The only other after-discovered evidence was that of Wm. Blackmore, of Ohio, a blacksmith, who Church, the defendant swears he is informed and believes, would testify that two or three days after January 9, 1876, he went to Weaver's house to collect a blacksmith's bill, which Weaver owed him; that he recognized him, and remembered the exact amount he owed him, and directed his wife to pay the bill. This was of course known to Mrs. Weaver, and she was a witness for the defendants at the trial, and if she could she would have stated this fact; and if she could not, the statement of this Blackmore, could have had but little weight with the jury. It certainly ought not uncorroborated by Mrs. Weaver, to have produced a different result. If what is here stated be true, it would certainly have required very little diligence on the part of Church to have discovered the evidence before the trial, as it was known to the foster mother of his wife. He does not state, how he happened to discover this new evidence within five days after the verdict was rendered, and could not discover it before the trial, though this issue was not tried for two years after it was ordered.

If the courts were to grant new trials for after-discovered evidence, where no stronger reasons were shown for so doing than in this case, the result would be, that new trials would be asked for and obtained in almost every case involving any considerable amount. During the progress of this trial the court struck out, and refused to permit to be read to the jury, three questions and answers from the deposition of Angelina Seeds, offered by the defendant, and refused to strike out fourteen questions and answers in the plaintiff's deposition, but permitted them to be read to the jury. And the appellants claim, that they were prejudiced before the jury by this action of the court. The questions propounded to the defendants' witness, Angelina Seeds, the former wife of J. J. Weaver, were questions asking her to state the conversations she had had with any person, about the disposition J. J. Weaver had made of his property, and with whom did she have the conversations, and what was said; and whether she had said certain things to a certain party about this will, and whether she had said to anybody, that Mr. Weaver was under the influence of morphia. These questions were propounded on the examination in chief of Angelina Seeds, and were properly rejected. The only one of them which had the appearance of being proper, was the one asking her whether she had not said to a certain party a certain thing about Mr. Weaver's will; and as the evidence of this party about what Mrs. Weaver had said was excluded from the jury, it was of course proper to exclude her statement about this matter.

Of the fourteen questions and answers of the plaintiffs' depositions, which the court permitted to be read against the defendants' objections, six of them were propounded to witnesses to prove what they knew of the mental and bodily condition of John J. Weaver, which were answered by each witness stating that, he would when this will was made or about that time, have been willing to have transacted important business with him.

The principles laid down by this Court in the case of *Jarrett et al.* v. *Jarrett et al.*, 11 W. Va. 584, are, that the evidence of witnesses present at the execution of a deed is entitled to peculiar weight; and this is evidently equally appli-

cable to the evidence of witness present at the execution of a will. And, that the evidence of physicians and especially those who attended the maker of a deed and of course of a will, and who were frequently with him during the time that it was charged that he was incompetent, is entitled to great weight. Next to physicians and those who were present at the time the deed, and of course the will was executed, either as attesting witnesses or otherwise, are those whose intimacy in the family have given them the opportunity of seeing the party at all times, and watching the operations of his mind. The mere opinions of witnesses not experts, are entitled to little or no regard, unless they are supported by good reasons founded on facts, which warrant them; and if the reasons and facts on which they are founded are frivolous, the opinions of such witnesses are worth but little or nothing.

In the case before us, the facts and reasons of the witnesses were given to the jury, so that they had the opportunity of judging of the weight, which ought to be attached to the opinion of each of the witnesses, and there being given, the witness may according to this case, give his opinion as to the competency of the grantor or of course a testator. In a particular case this opinion may be worth very little, still it is competent and relevant testimony, when thus accompanied by the facts on which it is based; and it was properly not excluded from the jury. It is true as decided in that case, it requires more capacity to make a valid deed than it does to make a will; and therefore, the incapacity of J. J. Weaver to transact important business, would not necessarily lead to the conclusion that he was incompetent to make his will. Nevertheless, his incompetency to transact important business would properly go before the jury for what it is worth, as tending to throw light on the issue they were trying, and after a witness stated the facts on which he based his opinion, he had a right to say that in his opinion he was not in a mental condition to transact important business.

The value of such testimony must depend in a large degree, on the facts on which the opinion is based, but the court could not, after having the facts stated, properly refuse to let the opinion of the witness on this point be stated to the jury.

Nor was there any error in the court permitting the other questions and answers in the depositions of the plaintiffs in this cause, being read to the jury, which were objected to, and which were permitted to be read.

The other questions and answers, which the court permit in the depositions, the plaintiffs in this cause to ask about and the witness to answer, had reference to the relations and feelings of J. J. Weaver to Teresa Dower, and his acknowledgment of her as his child; and his doubting, whether the defendant Ann Eliza Church, was his child; and as to statements made by Mrs. Weaver now Angelina Seeds, as to her dissatisfaction with the disposition of his property made in 1868. The court did not err in permitting this evidence to go to the jury. Angelina Seeds had sworn, that she was satisfied with the disposition J. J. Weaver had made of his property in 1868, by his will; and the plaintiffs in this cause had a right to show, that this was not so, and thus to strengthen their evidence which tended to show, that she took advantage of his weakened condition both of mind and body, to induce or force him to change this will and execute another, which would meet with her approval, and not with his wishes. And they had equally as clear a right to show, that he recognized Teresa Dower, for whom by the contested will he made no provision, as his child and did not recognize Ann Eliza Church as his child, to whom after his wife's death, he gave all his property by the contested will. See *McKee* v. *Nelson*, 4 Cow. 355; *Peck* v. *Cary*, 27 N. Y. 9; *Gombault* v. *Public Adm'r* 4 Bradf. (N. Y.) 226; *Coffin* v. *Coffin*, 23 N. Y. 9; *Lynch* v. *Clements*, 24 N. J. Eq. R. 431; *Bitner* v. *Bitner*, 65 Pa. St. R. 347.

It only remains to determine, whether the circuit court erred in refusing to set aside the verdict on the motion of the defendants in this cause, as contrary to the evidence and the law. The facts as we have stated them do show, that the attending physician of J. J. Weaver, as well as the attesting witnesses, and some of the parties who had the best opportunity to judge, all testified to the competency of the testator; and the attesting witness and some others testify to facts, which would seem clearly to show, that he was when he made the will in controversy, of sound mind and disposing memory.

But on the other hand a large number of witnesses who saw him but a short time, either before or after this will was made including his consulting physician, testify to facts in reference to his condition, which seem to be irreconcilable with this testimony of the defendants in this cause, to which I have referred.   The jury could scarcely believe the statements of many of these witnesses, and yet believe that attesting witnesses and others had fairly detailed to them the facts and occurrences, which they say occurred just before or just after the will was executed.   This conflicting evidence the jury could not reconcile.   They concluded, that the testimony which tended to show the incompetency of the testator, was entitled to the most weight strengthened as it was by the fact, that the testator when of a perfectly sound mind and disposing memory, had some eight years before made a will, whereby after his wife's death he gave half of his large property to Teresa Dower, whom he acknowledged to be his child ; and that he repeatedly and up to within a few days of the time when it is claimed he executed this last will, declared himself satisfied with his former disposition of his property, and would not change it.

The jury too, upon the evidence may well have supposed, that undue and improper influence may have been brought to bear to obtain the execution of the last will.   And though we might think the evidence on this point, not very strong, still it was with the jury to judge of its weight.   Had they found a verdict for the will, the court could not with propriety have set aside the verdict.   For there was much evidence as we have seen to show, that the intestate was unquestionably competent to make a will; and it was further shown, that he had frequently said he would give Teresa Dower nothing, because her husband against his wishes, had engaged in selling whisky as a business.

The case however was one, whose decision must have largely depended upon the weight, which the jury gave to the evidence respectively of the plaintiffs and the defendants. This was to a large extent conflicting.   If only the evidence offered by the defendants in the cause was considered, there could not have been a verdict rendered against the will; and on the other hand, if the evidence offered by the plaintiffs

in the cause, and that portion of the evidence offered by the defendants which did not conflict with the plaintiffs' evidence, the jury could not have done otherwise than find as they did, that the paper which had been probated was not the will of the intestate.

The rule which governs the granting of new trials in a case of this character, when the evidence is all parol evidence and is conflicting, is well established. The rules which govern in granting new trials generally, in issues out of chancery, and those governing the granting of new trials in common law suits differ somewhat. See *Barker* v. *Ray*, 2 Russ. R. p. 63; 3d English Law and Ch. R. p. 31; *Tompkin's Ex'r* v. *Stephens et al.*, 10 W. Va. p. 156; *Head* v. *Head*, 1 Sim. and St. 156; 1 Eng. and Ch. R. p. 74; *Apthorpe* v. *Comstock*, 2 Paige R. 487; *Henry* v. *Davis*, 7 W. Va. 720.

But in the trying of this particular issue in this case of *deviavit vel non*, the rule which governs a common law court in granting new trials prevails, and that rule is, that in reviewing the action of the court below when the evidence is all parol evidence, and it is conflicting, the appellate court will reject all the evidence of the exceptor, which is in conflict with the other party; and upon the evidence of the appellee giving it full force and effect and that of the appellant not in conflict with it, the case is in favor of the appellee, the verdict of the jury and the decree based upon it will be approved and affirmed. See *Lambert* v. *Cooper's Ex'ors*, 29 Gratt. 61; *Webb* v. *Dye*, 18 W. Va. p. 376. See also *Nicholas* v. *Kirshner*, 20 W. Va. p. 251. That the same principles prevail in the granting of new trials when the evidence is conflicting, appears from the following West Virginia cases: *Seibright* v. *State*, 2 W. Va. 591; *Newlin* v. *Beard et al.*, 6 W. Va. 110; *Gaus* v. *Kammer*, 9 W. Va. 64; *Tracy* v. *Cloyd*, 10 W. Va. 19; *Miller* v. *Insurance Co.*, 12 W. Va. 116; *Nease* v. *Capehart*, 15 W. Va. 299, and *Sheff et ux.* v. *The City of Huntington*, 16 W. Va. 308.

Upon these principles this Court can not in this case set aside the verdict of the jury, nor would it have done so had the verdict been in favor of the will. It was a case peculiarly appropriate for the determination of a jury, depending largely on the credibility of the witnesses. Our conclusion therefore

is, that the decree of November 1, 1879, is not erroneous in so far as the court expressed the opinion, that the plaintiffs were entitled to the relief prayed for, in so far as they ask the setting aside of the paper writing purporting to be the last will and testament of John J. Weaver, deceased, probated by the county court of Mason county, on the 24th of January, 1876; and so far as it adjudged, that it was not and is not, nor was nor is any part thereof the will of John J. Weaver, deceased; and so far as it set aside and annulled the said order, probating said paper as the last will and testament of John J. Weaver.

But after doing this, the court proceeded at the request of the plaintiffs, in order give them an opportunity in this suit of setting up and establishing the will, alleged in their bill to have been made and published in 1868, and alleged to have been lost or destroyed, to remand this cause to rules with leave for the plaintiffs to amend their bill, by making the heirs at law of John J. Weaver, defendants thereto, and with leave to have the process issued and served upon them to answer said bill as amended.

This decree must therefore be amended by this Court, by striking out this portion of it, and in lieu thereof adjudging, that the defendants in the court below pay to the plaintiffs in the court below their costs in the circuit court expended, and providing, that this decree shall in no manner prejudice the plaintiffs or any of them in any suit or proceeding of any sort, which they may be advised to institute to have the will alleged to have been executed in 1868, either probated or established in a court of equity. And this decree being thus corrected, must be affirmed by this Court, and the appellees must recover of the appellants their costs in this Court expended and thirty dollars damages, and this decree must be certified to the circuit court of Mason county.

JUDGES HAYMOND AND JOHNSON CONCURRED.

DECREE CORRECTED AND AFFIRMED.